**APPENDIX I**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Barbara A Scibeck, Individually and as | : | CIVIL ACTION |
| Admin. Of Estate of Walter Scibeck | : | |
| v. | : | |
| | : | |
| SEE ATTACHED LIST | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                           ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                              (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( )


| | | |
|---|---|---|
| 4/17/09 | _Mudphelr_ Plaintiff | |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-557-0099 | 215-557-0673 | mcuker@wcblegal.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff:___105 Arbor Drive, Myerstown, PA 17087_____

Address of Defendant:_____SEE ATTACHED SHEET_____

Place of Accident, Incident or Transaction:_____Pottstown, Pennsylvania_____
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))
Yes□   NoX

Does this case involve multidistrict litigation possibilities?    Yes□    NoX
RELATED CASE, IF ANY:

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes□   NoX

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated
action in this court?
Yes□   NoX

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously
terminated action in this court?
Yes□   NoX

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes□   NoX

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A.  Federal Question Cases:
1. □ Indemnity Contract, Marine Contract, and All Other Contracts

2. □ FELA
3. □ Jones Act-Personal Injury
4. □ Antitrust
5. □ Patent

6. □ Labor-Management Relations

7. □ Civil Rights

B.  Diversity Jurisdiction Cases:
1. □ Insurance Contract and Other Contracts
2. □ Airplane Personal Injury
3. □ Assault, Defamation
4. □ Marine Personal Injury
5. □ Motor Vehicle Personal Injury
6. □ Other Personal Injury (Please specify)
7. X Products Liability

8. ☐ Habeas Corpus

8. ☐ Products Liability — Asbestos

9. ☐ Securities Act(s) Cases

9. ☐ All other Diversity Cases
(Please specify)

10. ☐ Social Security Review Cases

11. ☐ All other Federal Question Cases
(Please specify)

## ARBITRATION CERTIFICATION
(Check appropriate Category)

I,_____Mark R. Cuker_____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case        exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: ___4|17|09_____    _____[signature]_____    __21182__

Attorney-at-Law                                          Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.**

DATE: ___4|17|09_____    _____[signature]_____    __21182__

Attorney-at-Law                                          Attorney I.D.#

CIV. 609 (6/08)

°%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

APPENDIX H

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Barbara A. Scibeck, Individually and as Executrix of the Estate of
Walter Scibeck; 105 Arbor Drive, Myerstown, PA 17067

## DEFENDANTS

Air Products & Chemicals, Inc.
CT Corporation Systems, 1300 E. 9th Street, Cleveland, OH 44114
SEE ATTACHED SHEET

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Mark R. Cuker, Esquire. Williams Cuker Berezofsky
1617 JFK Blvd., Suite 800, Philadelphia, PA 19103

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☐ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☒ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☒ 195 Contract Product Liability | ☒ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     (specify)

☐ 6 Multidistrict
     Litigation

☐ 7 Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332

Brief description of cause:
Wrongful Death

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
     UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
April 16, 2009

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**THE AMERICAN CHEMISTRY  COUNCIL**
Individually and as successor-in-interest to the
MANUFACTURING CHEMISTS
ASSOCIATION and the CHEMICAL
MANUFACTURERS ASSOCIATION
United States Corporation Company
80 State Street
Albany, New York 12207

**BORDEN CHEMICAL, INC.**
**N/k/a HEXION SPECIALTY CHEMICALSINC.**
f/k/a BORDEN, INC.
Prentice Hall Corporation
50 West Broad Street
Columbus, Ohio 43215-4321

**CHEVRON U.S.A., INC.**
Individually and as successor-in-interest
to GULF OIL, CO. Prentice Hall Corp.
50 West Broad Street
Columbus, Ohio 43215-4321

**CONOCOPHILLIPS COMPANY**
Individually and as successor-in-interest
To Continental Oil, Co., Thompson-Apex
Company, Conoco, Inc. and Conoco
Chemicals, Inc., incorporated in the State of
Delaware with principal place of business in
The State of Texas
600 North Dairy Ashford Road
Houston, TX  77079

**THE DOW CHEMICAL COMPANY**
CT Corporation System
1300 East 9th Street
Cleveland, Ohio 44114-4411

**ETHYL CORPORATION**
330 S. 4th Street
Richmond, Virginia 23219-4350

**GEORGIA PACIFIC CORPORATION**
133 Peachtree Street, NE
Atlanta, Georgia 30303

**GOODRICH CORPORATION**
Formerly known as B.F. GOODRICH COMPANY
CSC-Lawyers Inc. Svc.
50 W. Broad Street, Suite 1800
Columbus, Ohio 43215

**THE GOODYEAR TIRE AND RUBBER COMPANY**
C. Thomas Harvie
1144 East Market Street
Akron, Ohio 44316-4431

**HONEYWELL INTERNATIONAL, INC.**
F/k/a known as ALLIED SIGNAL, INC.
Individually and as successor-in-interest to
ALLIED CHEMICAL CORPORATION
CSC-Lawyers Inc. Svc.
50 W. Broad Street, Suite 1800
Columbus, Ohio 43215

**OLIN CORPORATION**
818 W. 7TH Street
Los Angeles, California 90017

**POLYONE CORPORATION**
Individually and as successor-in-interest to
The GEON COMPANY
Suite 36-5000
200 Public Square
Cleveland, Ohio 44114-2304

**RHONE-POULENC, INC.**
**N/k/a BAYER CROPSCIENCE**
Individually and as successor-in-interest to
STAUFFERCHEMICAL COMPANY
CT Corporation
1300 E. 9th Street
Cleveland, Ohio 44114

**UNIROYAL, INC.**
Individually and as successor-in-interest to
U.S. RUBBER CO. and UNIROYAL
CHEMICAL COMPANY, INC.
Prentice-Hall Corp. System
50 West Broad Street
Columbus, Ohio 43215

**ZENECA, INC.**
Individually and as successor-in-interest to
ICI AMERICAS, INC.
C T Corporation
1300 E. 9th Street
Cleveland, Ohio 44114

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**BARBARA A. SCIBEK**                               )
Individually and as Executrix of the               )          **CASE NO.**
Estate of Walter Scibek                             )
105 Arbor Drive                                     )
Myerstown, PA 17067                                 )
                                                    )          **JURY TRIAL DEMANDED**
                Plaintiff,                          )
                                                    )
vs.                                                 )
                                                    )
**AIR PRODUCTS & CHEMICALS, INC.**                  )
Serve at:                                           )
C T Corporation System                              )
1300 E. 9th Street                                  )
Cleveland, Ohio 44114                               )
                                                    )
and                                                 )
                                                    )
**THE AMERICAN CHEMISTRY  COUNCIL**                 )
Individually and as successor-in-interest to the   )
MANUFACTURING CHEMISTS                              )
ASSOCIATION and the CHEMICAL                        )
MANUFACTURERS ASSOCIATION,                          )
Serve at:                                           )
United States Corporation Company                   )
80 State Street                                     )
Albany, New York 12207                              )
                                                    )
and                                                 )
                                                    )
**BORDEN CHEMICAL, INC.**                           )
**N/k/a HEXION SPECIALTY CHEMICALS,**               )
**INC.,** f/k/a BORDEN, INC.                        )
Serve at:                                           )
Prentice Hall Corporation                           )
50 West Broad Street                                )
Columbus, Ohio 43215-4321                           )
                                                    )
and                                                 )
                                                    )
**CHEVRON U.S.A., INC.,**                           )
Individually and as successor-in-                   )
interest to GULF OIL, CO.                           )
Serve at:                                           )

Prentice Hall Corp.                                    )
50 West Broad Street                                   )
Columbus, Ohio 43215-4321                              )
                                                       )
and                                                    )
                                                       )
**CONOCOPHILLIPS COMPANY,**                            )
Individually and as successor-in-interest             )
To Continental Oil, Co., Thompson-Apex                )
Company, Conoco, Inc. and Conoco                      )
Chemicals, Inc., incorporated in the State of         )
Delaware with principal place of business in          )
The State of Texas                                     )
600 North Dairy Ashford Road                          )
Houston, TX  77079                                     )
                                                       )
and                                                    )
                                                       )
**THE DOW CHEMICAL COMPANY**                          )
Serve at:                                              )
CT Corporation System                                  )
1300 East 9th Street                                   )
Cleveland, Ohio 44114-4411                            )
                                                       )
and                                                    )
                                                       )
**ETHYL CORPORATION**                                 )
Serve at:                                              )
330 S. 4th Street                                )
Richmond, Virginia 23219-4350                         )
                                                       )
and                                                    )
                                                       )
**GEORGIA PACIFIC CORPORATION**                       )
Serve at:                                              )
133 Peachtree Street, NE                              )
Atlanta, Georgia 30303                                )
                                                       )
and                                                    )
                                                       )
**GOODRICH CORPORATION,**                             )
Formerly known as                                      )
B.F. GOODRICH COMPANY,                                )
Serve at:                                              )
CSC-Lawyers Inc. Svc.                                 )
50 W. Broad Street, Suite 1800                        )

2

Columbus, Ohio 43215                          )
                                              )
                                              )
**THE GOODYEAR TIRE AND RUBBER**              )
**COMPANY**                                   )
Serve at:                                     )
C. Thomas Harvie                             )
1144 East Market Street                       )
Akron, Ohio 44316-4431                        )
                                              )
and                                           )
                                              )
**HONEYWELL INTERNATIONAL, INC.**             )
F/k/a known as ALLIED SIGNAL, INC.,           )
Individually and as successor-in-interest to  )
ALLIED CHEMICAL CORPORATION,                  )
Serve at:                                     )
CSC-Lawyers Inc. Svc.                         )
50 W. Broad Street, Suite 1800                )
Columbus, Ohio 43215                          )
                                              )
and                                           )
                                              )
**OLIN CORPORATION**                          )
Serve at:                                     )
818 W. 7TH Street                        )
Los Angeles, California 90017                 )
                                              )
and                                           )
                                              )
**POLYONE CORPORATION,**                      )
Individually and as successor-in-interest to  )
Serve at:                                     )
The GEON COMPANY                              )
Suite 36-5000                                 )
200 Public Square                            )
Cleveland, Ohio 44114-2304                    )
                                              )
and                                           )
                                              )
**RHONE-POULENC, INC.**,                      )
**N/k/a BAYER CROPSCIENCE,**                  )
Individually and as successor-              )
in-interest to STAUFFER                       )
CHEMICAL COMPANY,                             )
Serve at:                                     )

3

CT Corporation                                              )
1300 E. 9th Street                                              )
Cleveland, Ohio 44114                                       )
                                                            )
and                                                         )
                                                            )
**UNIROYAL, INC.,**                                         )
Individually and as successor-in-interest to               )
U.S. RUBBER CO. and UNIROYAL                                )
CHEMICAL COMPANY, INC.,                                     )
Serve at:                                                   )
Prentice-Hall Corp. System                                  )
50 West Broad Street                                        )
Columbus, Ohio 43215                                        )
                                                            )
and                                                         )
                                                            )
**ZENECA, INC.**                                            )
Individually and as successor-in-interest to               )
ICI AMERICAS, INC.                                          )
Serve at:                                                   )
C T Corporation                                             )
1300 E. 9th Street                                              )
Cleveland, Ohio 44114                                       )
                                                            )

# COMPLAINT (CIVIL ACTION)

## NATURE OF ACTION

1.      This action is brought on behalf of all the decedent's next of kin, including his

children, to assert all rights and remedies permitted with respect to a wrongful death action.

Plaintiff therefore seeks damages that are fair and just for the following, proximately caused by

the misconduct of defendants:

      a.  Sorrow, mental anguish and solace, which may include society, companionship,

        comfort, guidance, kindly offices and advice of the decedent.

      b.  Compensation for reasonably expected loss of income of decedent, and services,

protection, care and assistance provided by decedent.

c. Expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death, and

d. Funeral expenses.

2. This action is also brought on behalf of the Estate of the decedent to assert all rights and remedies permitted with respect to a survivorship action for the pain and suffering, loss of income, medical expenses, loss of enjoyment of life and all other injuries and damages suffered by plaintiff's decedent prior to his death as a proximate result of defendants' misconduct.

3. This action is brought by plaintiff also on behalf of Barbara Scibek, decedent's spouse, for her losses, arising from the death of her husband.

4. Plaintiff's decedent was exposed to vinyl chloride during the course of his employment at the Firestone plant in Pottstown, Pennsylvania, and died in Pennsylvania as a result of angiosarcoma of the liver.

## PARTIES

5. The plaintiff, Barbara Scibek, is the widow of the decedent, Walter Scibek, the Administratrix of his estate, and resides at 105 Arbor Drive in Myerstown, Pennsylvania.

6. There are two surviving children of the decedent, Walter Scibek.

7. The defendants are the following:

- AIR PRODUCTS & CHEMICALS, INC., which is incorporated in the state of Delaware and has its principal place of business in the state of Pennsylvania;

- THE AMERICAN CHEMISTRY COUNCIL, f/k/a THE CHEMICAL MANUFACTURERS ASSOCIATION AND THE MANUFACTURING CHEMISTS ASSOCIATION which is incorporated in the state of New York and has its principal place of business in the state of Virginia;

- BORDEN CHEMICAL, INC., formerly known as Borden, Inc. and which

5

is incorporated in the state of New Jersey and which has its principal place of business in the state of Ohio;

- CHEVRON, U.S.A., successor-in-interest to GULF OIL COMPANY and which is incorporated in the state of Delaware and which has its principal place of business in the state of California;

- CONOCOPHILLIPS COMPANY, Individually and as successor-in-interest to Conoco, Inc., Continental Oil Co., Thompson-Apex Company and Conoco Chemicals, Inc.

- THE DOW CHEMICAL COMPANY, which is incorporated in the state of Delaware and has its principal place of business in the state of Texas;

- ETHYL CORPORATION, which is incorporated in the Commonwealth of Virginia and has its principal place of business in the Commonwealth of Virginia;

- GEORGIA PACIFIC CORPORATION, which is incorporated in the state of Delaware and has its principal place of business in the state of Georgia;

- GOODRICH CORPORATION, formerly known as B.F. GOODRICH COMPANY which is incorporated in the state of New York and has its principal place of business in the state of North Carolina;

- GOODYEAR TIRE AND RUBBER COMPANY, which is incorporated in the state of Ohio and has its principal place of business in the state of Ohio;

- HONEYWELL INTERNATIONAL, INC., formerly known as ALLIED SIGNAL, INC., Individually and as Successor-in-interest to ALLIED CHEMICAL CORPORATION which is incorporated in the state of Delaware and has its principal place of business in the state of New Jersey;

- OLIN CORPORATION, which is incorporated in the State of Virginia and has its principal place of business in the State of Connecticut;

- POLYONE CORPORATION, formerly known as Geon, Inc., and which is incorporated in the state of Delaware and has its principal place of business in the state of Ohio.

- RHONE-POULENC, INC., Individually and as Successor-in-interest to STAUFFER CHEMICAL COMPANY which is incorporated in the state of Pennsylvania and has its principal place of business in the state of Pennsylvania;

6

- UNIROYAL, INC., Individually and as successor-in-interest to U.S. RUBBER CO. which is incorporated in the state of New York and has its principal place of business in the state of Connecticut;

- ZENECA, INC., individually and as successor-in-interest to ICI Americas, Inc., and which is incorporated in the state of Delaware and which has its principal place of business in the state of Delaware.

8. Defendants can be organized into two categories as follows:

   a. The Manufacturer/Supplier defendants produced the vinyl chloride to which decedent was exposed during the course of his employment at the Firestone plant in Pottstown, Pennsylvania. These defendants engaged in a breach of duty to warn, product liability violations, fraud and conspiracy by taking active steps to misrepresent and conceal the health hazards associated with vinyl chloride; and

   b. The Conspiracy defendants entered into agreements with the Manufacturer/Supplier defendants and Firestone to conspire to fraudulently misrepresent and conceal the hazards of vinyl chloride and took actions to substantially aid and abet the Manufacturer/Supplier defendants.

9. Upon information and belief, at all times material hereto, the following named defendants, were all manufacturers, producers, suppliers and sellers of the Vinyl Chloride Monomer (VCM) which was used at the Firestone Plant, during the period when the plaintiff's decedent's exposure to vinyl chloride occurred, and are hereinafter described collectively as the "Manufacturer/Supplier defendants":

   a. Air Products

   b. Borden

   c. Conoco

7

    d.  Dow Chemical Company

    e.  Ethyl Corporation

    f.  Goodrich Corporation, formerly known as B.F. Goodrich Company (hereafter "BFG")

    g.  Honeywell International, Inc., formerly known as Allied Signal, Inc., and successor-in-interest to Allied Chemical Corporation

    h.  Uniroyal, Inc.

10. The following defendants, in addition to the Manufacturer/Supplier defendants are collectively referred to as the "conspiring defendants" or "conspiracy defendants":

    a.  Air Products & Chemicals, Inc.

    b.  The American Chemistry Council, f/k/a The Chemical Manufacturers Association and the Manufacturing Chemists Association

    c.  Borden Chemical, Inc.

    d.  Dow Chemical Company

    e.  Ethyl Corporation

    f.  Georgia Pacific, Inc.

    g.  Honeywell International, Inc., formerly known as Allied Signal, Inc., and successor-in-interest to Allied Chemical Corporation.

    h.  The Goodyear Tire and Rubber Company

    i.  Chevron U.S.A individually and as <u>successor</u> in interest to Gulf Oil Corporation, ., Inc.

    j.  Olin Corporation

    k.  Rhone-Poulenc, Inc., individually and as successor-in-interest to Stauffer Chemical Company

    l.  Zeneca, Inc., f/k/a ICI Americas, Inc.

11. In the alternative, to the extent the evidence fails to show that any

8

Manufacturer/Supplier Defendant did not manufacture or supply VCM that was used at the Firestone Plant in Pottstown, that Manufacturer/Supplier defendant was also a "conspiring" defendant.

## JURISDICTION AND VENUE

12. Subject matter jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332, as this is an action between citizens of different states, in which the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Pennsylvania.

14. Defendants conduct business in the Commonwealth of Pennsylvania.

## BACKGROUND

15. Plaintiff's decedent was employed by the Firestone plant in Pottstown, Pennsylvania between the years 1951 and 1980.

16. During the course of his employment at the Firestone plant, plaintiff's decedent worked as a service utility operator, where he cleaned reactors or blend tanks; a bagger; a dryer operator; a centrifuge operator and a relief operator. These jobs involved working with and being exposed to vapor, steam and fumes containing vinyl chloride monomer ("VCM" or "vinyl chloride"). VCM is a colorless gas and can remain in a gaseous state at room temperature. The odor threshold for VCM is at or above 2,000 ppm. Plaintiff's decedent could often smell the vinyl chloride while he was working.

17. While engaged in the course of decedent's employment at Firestone, Mr. Scibek was

9

required and caused to work with, and in the vicinity of, vinyl chloride monomer.

18.   The exposure of Walter Scibek to vinyl chloride was the direct and proximate cause of his developing a cancer of the liver known as hepatic angiosarcoma.   He first experienced symptoms on or about January, 2008, and died a painful, premature and wrongful death on April 25, 2008, all as a direct and proximate result of the misconduct of the defendants herein.

19.   The conduct of the defendants as described herein was the direct and proximate cause of the  of the damages set forth in greater detail in the Worngful Death and Survival Action Counts below.

20.   Plaintiff's claims against the Manufacturer/Supplier defendants of the VC to which plaintiff's decedent was exposed arise out of the Manufacturer/Supplier's fraudulent concealment,  and deliberate and intentional  failure to warn plaintiff's decedent of known hazards and dangers of VC, and their conspiracy with Firestone and the conspiring defendants to conceal those dangers from Firestone's employees, including Plaintiff's decedent..

21.   The "conspiring defendants" are members of the VC/PVC industry, a small, closely coordinated industry which contained fewer than 30 companies who bought and sold products to each other as well as regularly made swaps and exchanges of their fungible vinyl chloride and polyvinyl chloride products.  They also include the trade organizations through which the members of the VC/PVC industry routinely acted.

22.   The plaintiff's claims against these conspiring defendants are for a conspiracy with, and aiding and abetting, the Manufacturer/Supplier defendants in their fraudulent concealment, breach of duty to warn and product liability violations and with Firestone to conceal the known dangers of vinyl chloride.  The trade associations and other defendants are each sued solely

10

based upon their own tortious acts.  No party is sued on the mere basis of attendance at trade association or scientific meetings or for merely belonging to a trade association.  The defendants agreed and aided and abetted one another to take the following actions:

    a.  Draft, publish and distribute SD-56 to fraudulently misrepresent and conceal defendants' knowledge about the dangers of vinyl chloride.

    b.  Conduct false and misleading medical and epidemiological studies for sole purpose of concealing and misrepresenting the known dangers of exposure to vinyl chloride.

    c.  Enter into a written secrecy pact regarding their knowledge of the carcinogenicity of vinyl chloride.

    d.  Misrepresent the "odor threshold" of vinyl chloride (the level at which a substance can be smelled) in order to misrepresent workers', including plaintiff's decedent's, exposures to vinyl chloride.

    e.  Disclose to workers, customers, the government and the public only those hazards they agreed to disclose in SD-56 so as to maintain a unified and consistent front that fraudulently concealed the vinyl chloride dangers and hazards defendants knew existed.

23.  All of the actions by defendants alleged in plaintiff's complaint were taken intentionally, purposely, deliberately and without justification.

**PARTICULARIZED ALLEGATIONS REGARDING THE MATERIAL MISREPRESENTATIONS, CONSPIRACY AGREEMENT AND SUBSTANTIAL <u>ASSISTANCE AMOUNTING TO AIDING AND ABETTING.</u>**

**A. Agreement to draft, publish and distribute SD-56 to fraudulently conceal <u>defendants knowledge about the dangers of vinyl chloride.</u>**

11

24. In or about 1930, Patty, an industrial hygienist, and the U.S. Bureau of Mines conducted a study of the acute toxic effects of vinyl chloride on guinea pigs. The study indicated injury to the liver and spleen.

25. Defendants recommended a TLV of 500 ppm largely as a result of a single guinea pig study even though there was no documentation of the systemic, chronic effects from long-term exposures at or below this level. Firestone recommended this 500 ppm exposure limit for polyvinyl chloride (PVC) plants and fabrication facilities for decades in spite of their knowledge that there was no scientific evidence supporting 500 ppm as a safe level for chronic injury or liver damage.\

26. Defendants accepted and recommended the 500 ppm exposure limit based exclusively on the Patty and the U.S. Bureau of Mines guinea pig study.

27. During the ensuing years, multiple studies indicated that VC caused liver injuries to exposed workers. These studies included a 1949 report of liver injury among Russian vinyl chloride workers; a 1957 Russian study again reporting liver injuries in VC workers; a 1959 Dow Chemical study showing liver damage in animals from exposures to VC as low as 100 ppm (and an inability to identify a "no-effect" level), resulting in Dow Chemical adopting a 50 ppm exposure limit for its own plants; a 1959 Canadian study showing liver injury to animals exposed to vinyl chloride (resulting in Ontario, Canada lowering the exposure limit from 500 ppm to 50 ppm); and a 1963 Romanian study finding liver disease in vinyl chloride workers.

28. In 1953, the Manufacturing Chemists Association (MCA) (later named the Chemical Manufacturing Association or "CMA" and then the American Chemical Council or the "ACC"), the trade association for the American chemical industry throughout all times relevant to the

12

instant action, along with the active participation of its General Safety Committee, drafted a

chemical safety data sheet for VC, known as SD-56. Continental Oil Company (Conoco), Dow

Chemical Company, Ethyl Corporation, Union Carbide Corporation, Tenneco, Allied Chemical

and B.F. Goodrich, among others, participated in the process of drafting, approving, revising,

publishing and disseminating SD-56.

29.   In spite of the information contained in studies known to defendants and the absence

of test data identifying a safe exposure limit, particularly with respect to either long term

exposures or chronic injuries, SD-56 stated 500 ppm was a safe exposure limit and that the only

hazards from VC were fire, explosion, frostbite burns and a mild general anesthesia.

30. Defendants agreed to disseminate SD-56, and nothing contrary to SD-56, in order to

conceal the hazards of vinyl chloride from workers, including plaintiff's decedent. They further

agreed that they would reject and prevent any changes to SD-56 that might disclose complete

and accurate information about vinyl chloride health hazards.

31. SD-56 fraudulently concealed known facts about VC. In spite of defendants'

knowledge to the contrary, and their knowledge that they lacked the facts to make such

assertions, SD-56 stated:

### 8.    HEALTH HAZARDS AND THEIR CONTROL

8.1    Hazards

8.1.1   GENERAL
   Aside from the risk of fire or explosion, vinyl chloride presents no other very
serious problem in general handling. The presently accepted maximum allowable
concentration is 500 ppm.

8.1.2   SYSTEMIC EFFECTS
   In concentrations well above 500 ppm. vinyl chloride acts as a mild general
anesthetic.

13

8.1.3  LOCAL EFFECTS
In contact with the skin vinyl chloride is irritating.  Prolonged contact will result in refrigeration and freezing.

8.2   Prevention and control
Vinyl chloride is not a serious industrial hazard provided precautions are taken to avoid leaks or spills which might provide a fire or explosion hazard.

32.  SD-56 was distributed by the Manufacturer/Supplier defendants to employees and customers with the intent that it be relied upon throughout the industry and by workers, including plaintiff's decedent, but to disclose only the mild hazards of vinyl chloride which defendants wished to disclose.  SD-56 was relied upon throughout the VC and PVC industry, and by the plaintiff's decedent.

33.  Defendants agreed to disseminate SD-56 throughout the VC and PVC industry, knowing it to be false and fraudulent, and intending it to be used by employers, including Plaintiff's decedent's employer, to train employees in the industry.

      a.  Herman Waltemate, a safety manager for B.F. Goodrich, testified that the training provided by B.F. Goodrich to its employees was based upon the information in SD-56 and that prior to about 1969 no other information was provided.

      b.  Bruce Eley, a former industrial hygienist who worked in PVC plants for Monsanto, executed an affidavit in which he stated "when I started work with Monsanto in 1969, SD-56 was relied on throughout the industry to disclose the hazards of vinyl chloride and that the only hazard it disclosed is mild irritation and exposure";

      c.  B.F. Goodrich, in Answers to Interrogatories, stated that the only warnings it made available to vinyl chloride purchasers between 1952 and 1974 was through

14

SD-56;

d. Union Carbide's R.N. Wheeler admitted under oath in 1999 that Union Carbide distributed SD-56 throughout the 1950's and 1960's to its customers despite it not being reflective of Union Carbide's internal policy for exposure limits to vinyl chloride; and

34. On October 2, 1953, MCA's A.J. Wuertz, Secretary of the MCA General Safety Committee, wrote to the members of the General Safety Committee and the MCA Medical Advisory Committee regarding distribution of SD-56. This letter identified the producers and users of vinyl chloride responsible for that particular draft of SD-56 as B.F. Goodrich, Dow Chemical, Firestone, Goodyear and Uniroyal.

35. On May 12, 1959, V.K. Rowe of Dow Chemical wrote to B.F. Goodrich's Corporate Industrial Hygienist, W.E. McCormick, regarding vinyl chloride's chronic toxicity and the inadequacy of the then existing exposure standard published by the American Conference of Governmental Industrial Hygienists stating: "We feel quite confident, however, that 500 ppm is going to produce rather appreciable injury when inhaled seven hours a day, five days a week for an extended period." This information was not provided to plaintiff's decedent. In spite of its knowledge that 500 ppm was not a safe exposure limit, Dow continued to publicly support that limit and disseminated SD-56, in furtherance of the conspiracy among defendants.

36. By 1961, Dr. Torkelson published Dow Chemical's animal study as a scientific article in a technical scientific journal. Defendants did not distribute this information to their employees and agreed not to change SD-56. In particular, Firestone did not inform plaintiff's decedent or other employees in their plants of this information. Firestone and defendants

15

continued to assure workers and others that they could rely on the SD-56 statement that exposure below 500 ppm was safe.

37.  On November 24, 1959, Union Carbide acknowledged in inter-company correspondence that the TLV of 500 ppm had been "based largely on single guinea pig inhalation studies by the Bureau of Mines about 25 years ago." The letter also noted that V.K. Rowe had stated that Dow Chemical's inhalation study "has not found a no-effect level. Even 100 ppm produced organ weight changes and gross pathology with micropathology expected. The author concluded that vinyl chloride monomer is more toxic than has been believed." The defendants agreed among themselves that SD-56 would not be changed and continued to tell the world, including the plaintiff's decedent, that exposure to vinyl chloride below 500 ppm was safe; nor did any of the defendants seek to inform plaintiff's decedent of the toxicity of VC.

38.  In 1963, a Romanian study was published by Dr. Suciu finding liver damage in workers, including hepatomegaly caused by vinyl chloride. The study, which Firestone and defendants obtained, noted that the liver damage could become chronic.

39.    On March 18, 1963, MCA investigated medical literature addressing the "carcinogenic effects of plastics," including nine articles about cancers resulting from implanted plastics. This information was not provided to plaintiff's decedent or other workers being exposed to vinyl chloride.

40.  On June 7, 1965, Rex Wilson of B.F. Goodrich wrote to a doctor treating a B.F. Goodrich employee who was suffering from liver damage caused by vinyl chloride exposure. Rex Wilson wrote that VC was recognized in "our experience" as a hepatotoxin and noted that because of this knowledge, B.F. Goodrich conducted liver function tests on exposed workers.

16

Yet, B.F. Goodrich Safety Director, Herman Waltemate, testified that he did not learn that VC was a hepatotoxin until a decade later. Nor was this information provided to plaintiff's decedent.

41. On October 13, 1965, William McCormick, a senior corporate officer at B.F. Goodrich, sent to Dr. Kelly of Monsanto a copy of a Romanian study that described the development of liver damage in PVC workers. Mr. McCormick instructed that the paper and its conclusions were to be held in strictest confidence.

42. On April 6, 1966, B.F. Goodrich's William McCormick wrote an internal memorandum to B.F. Goodrich Vice President Anton Vittone in which he noted that the American Conference of Governmental Industrial Hygienists (ACGIH) was again proposing that the 500 ppm TLV for vinyl chloride be reduced to 50 ppm. Defendants continued to declare in SD-56 that the safe exposure level was 500 ppm. Defendants took steps to ensure ACGIH did not lower the TLV below the 500 ppm recommended by defendants' in SD-56.

43. On October 6, 1966 the Manufacturing Chemists Association (MCA) PVC resin producers and the MCA Occupational Health Committee met in Cleveland, Ohio. The group discussed acroosteolysis, a disease suffered by vinyl chloride workers, which they said had never been previously observed. B.F. Goodrich's data was presented and it was specifically recognized that there was a definite health problem related to polyvinyl chloride manufacture. B.F. Goodrich requested that participants maintain the secrecy of the problem to which the other participants agreed. The information was to be treated as confidential. Any new finding was to be communicated to MCA or B.F. Goodrich's Dr. Wilson. Representing and acting officially on behalf of their employers in this meeting were:

(i)    B.F. Goodrich (W.E. McCormick, Rex H. Wilson, M.D., Wade Miller, Thomas B. Nantz and A. Vittone),

(ii)    Allied Chemical (Dr. R.D. Williams),

17

(iii)    Atlantic Tubing and Rubber (Dan Carberry and Glenn D. Smith),

(iv)    Borden Chemical (Nathan Blackman),

(v)     Cumberland Chemical Corp. (Dr. P.W. Townsend and J.A. Bourque, Jr.),

(vi)    Diamond Alkali (Dr. Richard W. McBurney and L.E. Ice),

(vii)   Dow Chemical (H. L. Gordon, M.D. and Earl R. Smith),

(viii)  Ethyl Corporation (Dr. George Roush),

(ix)    Firestone Plastics Co. (C.J. Kleinert),

(x)     General Tire and Rubber (Phillip R. Sayre and George Burkhardt),

(xi)    Goodyear Tire and Rubber Company (F.A. Cox and Dr. C.A. Johnson),

(xii)   Great American (Albert W. Fuhrman),

(xiii)  Hooker (Jerome Wilkenfeld),

(xiv)   Pantasote (John E. Ertel),

(xv)    Shawinigan (Dr. R.H. Stevenson),

(xvi)   Stauffer (H.R. Jepson and Don Hunter),

(xvii)  Tenneco (Elwood W. Phares and Robert R. Bouffard),

(xviii) Thompson Apex, Union Carbide (C.U. Dernehl, M.D. and R.N. Wheeler, Jr.),

(xix)   U.S. Rubber (C.B. Westerhoff and J.H. Wolfsie, M.D.).

44. In a memorandum dated June 21, 1968, B.F. Goodrich's J. DiSalvo acknowledged

that exposure of animals to VC at 500 ppm caused liver damage. Defendants did not inform

plaintiff's decedent or employees in their plants of this fact.

45. On January 26-27, 1970, the members of the MCA Safety and Fire Protection

Committee met in New York City, New York and discussed revising chemical safety data sheets.

Despite the fact that revisions to the SD-56 were being discussed and that the committee had

clear evidence that exposure to vinyl chloride at 500 ppm was dangerous to workers' health, this

group again refused to revise the safety data sheet to institute a lower ppm exposure level.

Representing and acting officially on behalf of their employers were:

(i)     Monsanto Company (G.L. Gorbell),

(ii)    The Dow Chemical Company (S.M. MacCutcheon),

(iii)   Olin Corporation (W.P. Paulsen),

(iv)    Allied Chemical Corporation (S. Schrieber),

(v)     Union Carbide Corporation (J.J. Walker),

(vi)    Manufacturing Chemists Association (F.G. Stephenson),

(vii)   Society of the Plastics Industry (A.L. King).

18

46. At the MCA Safety and Fire Protection Committee (SFPC) December 14, 1971 meeting in Washington, D.C., the participants again refused to change the 500 ppm exposure limit in SD-56. Representing and acting officially on behalf of their employers were:

(i)     Allied Chemical Corporation (Sanford Schreiber),
(ii)    B.F. Goodrich (D.L. Dowell),
(iii)   Monsanto Company (G.L. Gorbell),
(iv)    The Dow Chemical Company (S.M. MacCutcheon),
(v)     Union Carbide Corporation (J.J. Walker),
(vi)    Manufacturing Chemists Association (F.G. Stephenson).

47. On March 7, 1972 the MCA drafted a revised version of SD-56. In section 10, SD-56 stated that "vinyl chloride monomer does not present a serious industrial health hazard provided workers are adequately supervised and observe the proper means of handling it." Despite explicit knowledge to the contrary, SD-56 yet again assured that exposures up to 500 ppm were safe and that this level "provides considerable margin of safety for industrial exposures."

48. On May 29, 1973, B.F. Goodrich's Benjamin M.G. Zwicker wrote an internal memorandum to the B.F. Goodrich plant Managers entitled "Proposed Information Response to Employee Questions." The attached draft memo entitled "Human Health Effects of Vinyl Chloride" falsely states "We know of no serious problems with our employees from the proper use of vinyl chloride in our plants."

49. On May 31, 1973, R.N. Wheeler of Union Carbide sent a confidential memo discussing the plans of The Society of the Plastics Industry (SPI) approval for the use of PVC for drinking containers and to identify only the hazards identified in SD-56. In addition, the defendants decided that through the MCA Vinyl Chloride Research Projects Group, they would meet with NIOSH, but only disclose the hazards of SD-56 while concealing information they had regarding the carcinogenicity of vinyl chloride. In discussing these two actions, in which many

19

of the defendants participated actively and others were informed, Wheeler admitted in a

memorandum that the actions "could be construed as evidence of an illegal conspiracy."

50. On July 20, 1973, G.E. Best of the MCA wrote to the "management contacts" at

companies sponsoring the Vinyl Chloride Research Program and the MCA Technical Task

Group on Vinyl Chloride Research regarding the industry meeting with NIOSH on July 17,

1973. He indicated that despite definite knowledge to the contrary, the defendants only gave

NIOSH a copy of SD-56, which stated that exposure to vinyl chloride at levels less than 500 ppm

was safe. The "management contacts" active at that time who received this information

indicating a cover-up of vinyl chloride hazards were the following:

(i)     Air Products (Smith, Carey),
(ii)    Allied Signal (Knapp, Ferguson),
(iii)   B.F. Goodrich (McCormick, Johnson, Benjamin M.G. Zwicker and Dowell),
(iv)    Borden (Schmidt),
(v)     Conoco (Kennedy),
(vi)    Diamond Shamrock (McBurney, Zimmerman),
(vii)   Dow Chemical (Torkelson, Leathers and Rausch),
(viii)  Ethyl (Rinehart),
(ix)    Firestone (Madden),
(x)     Goodyear (Johnson, Francis),
(xi)    Monsanto (Roush),
(xii)   Olin (Gasque and O'Connell),
(xiii)  PPG (Bell, Widing),
(xiv)   Shell (Maycock),
(xv)    Stauffer (Lindquist),
(xvi)   Tenneco (Rosen and Aalto),
(xvii)  Union Carbide (Wheeler),
(xviii) Uniroyal (Harris).

51. None of the "management contacts" took any steps to correct the misinformation

provided to NIOSH. In particular, neither B.F. Goodrich nor any of the other defendants

disclosed to NIOSH that vinyl chloride was known by them to be a hepatotoxin.

52. On November 28, 1973, the Vinyl Chloride Research Coordinators of MCA met to

review and ratify the false information in the SD-56.  Participants were:

    (i)     The Dow Chemical Company (T.R. Torkelson),
    (ii)    Tenneco Chemicals, Inc. (T.E. Aalto for Marvin Rosen),
    (iii)   PPG Industries, Inc. (Z.G. Bell, Jr.),
    (iv)   Uniroyal, Inc. (W.D. Harris),
    (v)    Olin Corporation (Richard Henderson for M.R. Gasque),
    (vi)   Goodyear Tire & Rubber Company (C.A. Johnson),
    (vii)  B.F. Goodrich Company (M.N. Johnson, M.D.),
    (viii) Shell Chemical Company (H.L. Kusnetz for R.L. Maycock),
    (ix)   Stauffer Chemical Company (A.B. Lindquist),
    (x)    Ethyl Corporation (W.E. Rinehart).

    53.  On May 24, 1974, the MCA, on behalf of its members, issued a press release

containing a chronology of knowledge about vinyl chloride hazards.  The chronology issued by

the MCA affirmatively misstated the known hazards of exposure to VC and was incomplete and

misleading by concealing the historical knowledge and historical research concerning vinyl

chloride.  It was only in this document that defendants, through the MCA, disclosed that they had

known for decades prior to 1974 that exposure to vinyl chloride caused liver damage.

### Agreement to conduct false and misleading medical and epidemiological studies for the sole purpose of concealing and misrepresenting the known dangers of exposure to vinyl chloride.

    54.  Defendants knew when they first began manufacturing and working with vinyl

chloride that the liver was a target organ damaged by exposure to vinyl chloride.  Studies

repeatedly confirmed the liver was a target organ damaged by vinyl chloride exposure.

Defendants then learned that VC caused cancers at multiple human locations including, but not

limited to, the brain and liver and also knew that these cancers were caused by exposures that

were typical of on-going operations.  In spite of this knowledge, defendants continued to adhere

to and recommend the TLV of 500 ppm knowing they had no reliable scientific data upon which

to base their fraudulent representations that exposures below that level were safe.  These

21

fraudulent misrepresentations were continually made in spite of data known to defendants indicating exposures below 500 ppm caused damage to the liver and other organs.

55.  At least as early as 1963 or 1964, defendant B.F. Goodrich was testing the liver function of workers because of their knowledge of the hepatotoxicity of vinyl chloride.  The workers at B.F. Goodrich were not told of the purpose of the exams or of B.F. Goodrich's knowledge that vinyl chloride was toxic to the liver.  Nor did any of the defendants provide this information to the plaintiff's decedent.

### (1) Acroosteolysis Studies

56.  On November 12, 1964, B.F. Goodrich's Corporate Medical Director, Rex Wilson, wrote to Dr. J. Newman in Avon Lake, Ohio, where a B.F. Goodrich plant was located.  Dr. Wilson, digging for information about acroosteolysis, stated that B.F. Goodrich wanted employees examined for "hand disabilities" as quietly as possible.  Dr. Wilson also wanted the examinations to occur as rapidly as possible but only incidental to other examinations.  Dr. Wilson instructed, "we do not want to have this discussed at all, and I request that you maintain this information in confidence."

57.  On February 2, 1965, Robert A. Kehoe (Kettering Laboratory) wrote to Monsanto's Medical Director, R. Emmet Kelly, M.D.  Kehoe discussed the B.F.Goodrich hand problem, but instructed: "I shall be entirely willing, and am authorized to give you full information about this verbally, but I am not revealing the locus of the problem in writing at this time, since the people involved are deeply concerned despite the fact that there are very few cases, none of which has resulted in disability.  It is difficult not to conclude, on the face of the evidence, poor as it is, that this is an occupational disease."

22

58. On January 6, 1966, Monsanto's J. V. Wagner wrote an internal memorandum reflecting a conversation with B.F. Goodrich's Harry Warner, Corporate Vice President, in which Warner stated that B.F. Goodrich had first noticed the hand problem in workers several years before and that the problem had been noticed in employees who were not involved in kettle cleaning. Warner also told Wagner about a Belgian doctor who had seen these problems in PVC workers and was about to publish an article. According to Wagner's memo, "Goodrich was concerned enough about the response to such a published article that Mr. Warner attempted to have one of their representatives, who was in Europe, stop by and try to discourage or influence the wording of such an article to be sure that it didn't condemn PVC in general."

59. On January 7, 1966, Dr. Kelly of Monsanto circulated an internal memorandum regarding his meeting with B.F. Goodrich. The memo noted that Monsanto was x-raying people who were working in PVC polymerization. Dr. Kelly stated, "I am sure Dr. Nessell can prepare these people with an adequate story so that no problem will exist." Dr. Kelly also noted that he had to keep in contact with B.F. Goodrich because Dr. Wilson was on his way to Brussels to try and stop the publication of a paper. Dr. Kelly stated, "while this is not completely hush hush, I think discretion should be used to prevent any undue talking, and the name of Goodrich should be kept in the background."

60. On February 11, 1966, B.F. Goodrich's Dr. Rex Wilson M.D., wrote a confidential, internal company letter to Dr. Creech who cared for employees at the B.F. Goodrich facility located at Louisville, Kentucky. In this correspondence, Wilson asked Dr. Creech to "examine these people and determine whether or not they have any existing symptoms commensurate with Raynaud's disease or scleroderma." Included on the list of B.F. Goodrich employees that Dr.

Wilson informed Dr. Creech to examine was their first acroosteolysis case, manifesting in 1957.

Wilson informed Creech that arrangements for a study by the Kettering Laboratory of Cincinnati,

Ohio were made. The results of Kettering's study have never been released by defendants.

61. On December 21, 1966, the MCA Occupational Health Committee met in New York,

NY. It was decided that the association would enter into a contract with the University of

Michigan for an epidemiological study of acroosteolysis. Representing and acting officially on

behalf of their employers in this meeting were:

(i)     B.F. Goodrich (W.E. McCormick and Rex H. Wilson, M.D.),
(ii)    Union Carbide (C.U. Dernehl, M.D.),
(iii)   Monsanto (M.N. Johnson, M.D.),
(iv)    Minnesota Mining and Manufacturing (J.A. Pendergrass),
(v)     United States Rubber (J.H. Wolfsie, M.D.),
(vi)    MCA (F.H. Carman).

62. On August 21, 1967, B.F. Goodrich published the article "*Occupational*

*Acroosteolysis*" in the *Journal of the American Medical Association*. This article was written by

B.F. Goodrich management personnel Dr. Rex Wilson, M.D., William McCormick and Carroll

Tatum along with contract physician, Dr. John Creech, M.D. In the article they stated that the

cause of acroosteolysis was "not presently known." The article also stated that the syndrome

"may" be of occupational origin. Contrary to the article, Wilson and McCormick understood

that acroosteolysis was directly related to vinyl chloride exposure. Dr. Creech has admitted

under oath that he saw a draft of this paper where it was specifically stated that vinyl chloride

was the cause of acroosteolysis, but this admission was deleted from the final published paper.

The paper also falsely implied that the complaints began in mid-1964, when in fact they date

back to the 1950's.

63. On March 25, 1968, B.F. Goodrich received a proposal from Brooklyn Polytechnic

24

Institute in which Brooklyn Polytechnic Institute submitted a request for continued support for the vinyl chloride acroosteolysis work carried out under the sponsorship of B.F. Goodrich by Brooklyn Polytechnic Institute from March 1, 1967 to February 22, 1968. The results of this work by Brooklyn Polytechnic Institute on vinyl chloride have never been published or made available.

64. On June 26, 1968, B.F. Goodrich's W.E. McCormick wrote B.F. Goodrich company physicians, enclosing a memorandum summary stating that at the request of B.F. Goodrich, the Kettering Laboratory had reproduced acroosteolysis in hamsters. B.F. Goodrich and other defendants have never produced a copy of this study, nor was it ever published. The memorandum concluded that there would be no reporting to the State of Kentucky on occupational acroosteolysis without prior consultation with the B.F. Goodrich Medical Director in Ohio. This was done despite the Kentucky law requiring that occupational disease to be reported.

65. In February of 1969, the defendants listed below received a draft of a scientific publication from the University of Michigan that had been commissioned by MCA and paid for by these member defendants. The study recommended lowering exposure to vinyl chloride from 500 to 50 ppm and conducting low level monitoring. Recipients included:

      (i)     Union Carbide Corporation (C.U. Dernehl, M.D.),
      (ii)    Olin Mathieson Chemical Corporation (M.R. Gasque, M.D.),
      (iii)   Monsanto Company (M.N. Johnson, M.D.),
      (iv)   Gulf Oil Corporation (W.A. McClellan, M.D.),
      (v)    Minnesota Mining and Manufacturing Company (J.A. Pendergrass),
      (vi)   Uniroyal, Inc. (J.H. Wolfsie, M.D.),
      (vii)  MCA (F.G. Stehenson),
      (viii) The B.F. Goodrich Company (W.E. McCormick),
      (ix)   The Dow Chemical Company (T.R. Torkelson),
      (x)    Air Reduction Company, Inc. (Dr. Palmer W. Townsend and Joseph A. Bourque, Jr.),

(xi)    Firestone Tire & Rubber Company (Laurence H. Ballou, M.D. and George L. Wilson),

(xii)   Atlantic Tubing & Rubber Co. (Glenn P. Smith),

(xiii)  Borden Chemical Company (Nathan M. Blackman),

(xiv)  B.F. Goodrich Chemical Company (John L. Nelson, William E. McCormick and Rex H. Wilson),

(xv)   The Dow Chemical Company (Harold L. Gordon, M.D. and Earl R. Smith),

(xvi)  Goodyear Tire & Rubber Company (C.A. Johnson, M.D. and Frank A. Cox),

(xvii)  Great American Plastics Company (Albert W. Fuhrman),

(xviii) Gulf Oil Corporation (Howard E. Runion),

(xix)  United States Rubber Company (J.H. Wolfsie, M.D. and C.B. Westerhoff),

(xx)   Monsanto Company (William E. Nessell, M.D.),

(xxi)  The Pantasote Company (John E. Ertel),

(xxii)  Stauffer Chemical Company (Hans R. Jepsen, Jr.),

(xxiii) MCA (F.H. Carman and F.G. Stephenson),

(xxiv) Thompson Apex Company (Herbert Malin and Robert R. Dugan, M.D.),

(xxv)  Union Carbide Corporation (C.U. Dernehl, M.D.).

66. On March 4, 1969, B.F. Goodrich's W.E. McCormick wrote an internal "Company Confidential" memorandum to W.C. Becker, B.F. Goodrich Vice President of External Affairs, entitled "Report of Hand Disability Activities." McCormick noted that the University of Michigan's report had been distributed confidentially to the MCA Task Group for review and recommended that "(1) The association between reactor cleaning and the occurrence of AOL [Acroosteolysis] is sufficiently clear-cut that steps should be taken to minimize the exposure of workers responsible for this operation...Where it is necessary for workers to enter the reactor tanks, sufficient ventilation should be provided to reduce the vinyl chloride concentration to 50 ppm; (2) Because of increasing evidence that the disease AOL may have systemic manifestations involving bones and possibly other systems, recognized cases should be removed from further exposure and should be examined at intervals to determine whether there is any progression of the disease."

26

67. On April 30, 1969, the MCA Occupational Health Committee met in Washington,

D.C., where its members agreed to intentionally perpetrate the fraud that exposure up to 500

PPM was safe by voting to refuse to publish the University of Michigan's report, particularly its

recommendations. Instead the committee voted to accept the report for publication only if the

recommendation to lower the TLV to 50 PPM was eliminated. Representing and acting officially

on behalf of their employers at this meeting were:

    (i)     B.F. Goodrich Company (W.E. McCormick),
    (ii)    Union Carbide Corporation (C.U. Dernehl),
    (iii)   Gulf Oil Corporation (W.A. McClellan, M.D.),
    (iv)   Dow Chemical Company (T.R. Torkelson),
    (v)    Uniroyal, Inc. (J.H. Wolfsie, M.D.),
    (vi)   Manufacturing Chemists Association (F.G. Stephenson).

68. On May 6, 1969, the MCA PVC Resin Producers met in Washington, D.C.   In

furtherance of their continued plan to perpetrate the fraud that VC exposure up to 500 ppm was

harmless it was unanimously resolved "that the University of Michigan be permitted to publish

the scientific facts developed from the study as edited by the MCA members but that the

complete document now available to the OHC and the sponsoring companies not be released but

be held confidential for the sponsors only."   Participants at this meeting were:

    (i)     Goodyear Tire & Rubber Co. (Frank A. Cox),
    (ii)    Firestone Tire and Rubber Co. (Laurence H. Ballou),
    (iii)   Airco Chemicals & Plastics (John T. Barr),
    (iv)   The Pantasote Co. (Edwin T. Biehl, John E. Ertel, Harry A. Russell),
    (v)    Diamond Shamrock Corporation (Harold E. Birr),
    (vi)   Union Carbide Corporation (C.U. Dernehl, M.D.),
    (vii)   General Tire & Rubber Co. (M.G. Glenn, Robert W. Laundrie),
    (viii)  Monsanto Company (George W. Ingle, M.N. Johnson, M.D.),
    (ix)   B.F. Goodrich Chemical Company (William E. McCormick),
    (x)    B.F. Goodrich Chemical Company (John L. Nelson),
    (xi)   Allied Chemical Corporation (Cal Rehfuss),
    (xii)   Gulf Oil Corporation (Howard E. Runion),
    (xiii)  Tenneco Plastics Division (Arthur C. Siegal),
    (xiv)  Union Carbide Corporation (R.N. Wheeler, Jr.),

27

(xv)    Uniroyal, Inc. (J.H. Wolfsie, M.D.),
(xvi)   Manufacturing Chemists Association (George E. Best, F.H. Carman).

69. On April 7, 1970, the MCA Occupational Health Committee met in New York, N.Y.

and discussed the editorial changes required by the MCA committee. Thereafter, the published

paper failed to contain the key information concerning the health hazards of vinyl chloride.

Representing and acting officially on behalf of their employers were:

(i)     Union Carbide (K.S. Lane),
(ii)    Gulf (W.A. McClellan, M.D. and J. Hogan, M.D.),
(iii)   Minnesota Mining and Manufacturing (J.A. Pendergrass),
(iv)    Uniroyal (J.H. Wolfsie, M.D.),
(v)     Manufacturing Chemists Association (K.D. Johnson).

Representing and acting officially on behalf of their employer but not physically present

were:

(i)     Olin (Mac Roy Gasque, M.D.),
(ii)    Monsanto (M.N. Johnson, M.D.),
(iii)   B.F. Goodrich (W.E. McCormick),
(iv)    Dow Chemical (T.R. Torkelson).

70. In January of 1971 the University of Michigan published its epidemiologic study

"Occupational Acroosteolysis." The report that was actually published by the University of

Michigan failed to contain the 50 ppm recommendation for vinyl chloride exposure that it made

in its 1969 confidential version. Furthermore, the Michigan article listed 400 ppm as the lower

level of odor detection, when the 1969 report to the MCA contained a 4,100 ppm level. Workers

were deliberately mislead to believe that smelling vinyl chloride meant that they were being

exposed to 400 ppm instead of over 4,000 ppm. Also, the confidential 1969 report made a

recommendation for low level monitoring for VCM, which was absent from the published

version. These omissions were made because the defendants, as detailed above, agreed and acted

28

collectively to keep the damaging data developed by this study from their workers, the United States Government and the general public.

71.   At the Vinyl Chloride Safety Association Meeting on November 10-12, 1971, B.F. Goodrich and others present referred to acroosteolysis (AOL) as bone cancer.  These same defendants who described the systemic condition as "bone cancer" when executives met among themselves, agreed that they would describe acroosteolysis in different terms in order to minimize it when speaking to their workers.  They recognized that AOL is caused by repeated exposure to low concentrations of vinyl chloride (50 ppm) even though publicly and to workers they refused to admit that vinyl chloride caused AOL.

### (2) Cancer Studies

72.   In May of 1970, Dr. P. L. Viola, an Italian research scientist, disclosed at a conference in Houston, Texas, that animals exposed to 30,000 ppm of vinyl chloride developed cancer.  Shortly thereafter, in 1971, defendants learned from the Europeans that exposures at less than 5,000 ppm also caused tumors in animals.  In 1972, defendants learned from the European VC industry that vinyl chloride caused angiosarcoma of the liver in animals exposed to 250 ppm of vinyl chloride.  Defendants agreed to keep secret all information about the carcinogenicity of vinyl chloride learned subsequent to the first (May 1970) report of cancer.  Defendants then decided to conduct their own studies, which they would design and control, to try to refute the information they had learned from the Europeans (because they had not conducted research of their own, instead simply proclaiming that VC was safe).

73.  On February 20, 1973, B.F. Goodrich's representative (W.E. McCormick) participated in a meeting of the MCA Vinyl Chloride Research Coordinators.  At that meeting, it

29

was discussed how industry could best "defocus" potential concern about cancer by performing
its own study. A study proposed by Tabershaw Cooper & Associates (TCA) was specifically
intended to serve as a smokescreen so the U.S. companies could show "diligence" if ever
questioned about their knowledge and actions regarding vinyl chloride and cancer. In a
deliberate effort to conceal its knowledge and concern about cancer, the defendants issued a
press release concerning the study where the word "cancer" was not mentioned. Present at this
meeting were: T.R. Torkelson, Dow Chemical; Z.G. Bell, Jr., PPG; K.D. Harris, Uniroyal; R.L.
Maycock, B.F. Goodrich; W.E. Rinehart, Ethyl; R.N. Wheeler, Jr. Union Carbide.

74. On May 8, 1973, the MCA Board of Directors met in New York, N.Y. where they
approved the epidemiologic study explaining "the reason for moving quickly on this
epidemiologic study is so that the U.S. industry must be prepared to indicate diligence and derive
an appropriate handling of any problem that could arise."

75. On June 19, 1973, the MCA signed a contract with Tabershaw Cooper & Associates
(TCA) to conduct a cancer epidemiology study. This was within thirty days of a planned
industry meeting with NIOSH scheduled for July 17, 1973. MCA issued a press release on June
28, 1973 concerning this study. The press release on the TCA study intentionally did not contain
anything to imply that the U.S. vinyl producers had any reason to be concerned with
occupational cancer, and specifically deliberately directed attention away from any concern
about cancer. The twenty-nine (29) companies sponsoring that study were:

      (i)     Air Products,
      (ii)    Allied,
      (iii)   Borden,
      (iv)   Certainteed,
      (v)    Conoco,
      (vi)   Diamond Shamrock,
      (vii)  Dow Chemical,

(viii)  Ethyl,
(ix)    Exxon,
(x)     Firestone,
(xi)    Georgia Pacific,
(xii)   General Tire,
(xiii)  B.F. Goodrich,
(xiv)   Goodyear,
(xv)    W. R. Grace,
(xvi)   Great American,
(xvii)  Gulf,
(xviii) Hooker,
(xix)   Keysor Century,
(xx)    Monsanto,
(xxi)   Olin,
(xxii)  Pantasote,
(xxiii) PPG,
(xxiv)  RobinTech,
(xxv)   Shell,
(xxvi)  Stauffer,
(xxvii) Tenneco,
(xxviii)Union Carbide,
(xxix)  Uniroyal.

76. On October 15, 1973, TCA issued its second report on the epidemiology study that

discussed the ways a terminated employee might be followed. Further, TCA stated that several

companies had indicated that they did not wish their terminated employees to be contacted

directly. This effort to hide the hazard risk from older ex-employees concealed the true extent of

the cancer risk of vinyl chloride because the older retired employees were the most likely to have

cancer.

77. On December 19, 1973, TCA issued its third progress report on the epidemiology

study. TCA reported that the exposure level determination for the workers in the studies' cohort

was not accurate. The progress report indicated that older workers most likely to have cancers

from work exposures were excluded which not only concealed the cancer risk factor for those

workers but also falsely minimized the cancer risk of vinyl chloride.

31

78. On April 15, 1974, TCA issued the first "final report" of the epidemiology study to

MCA. The study reported a measurable excess of digestive cancers, especially the liver,

respiratory cancers and other unspecified cancers, including brain cancers which predominated.

**Agreement to enter into a secrecy pact regarding their knowledge of the carcinogenicity of VC.**

79. On September 11, 1970, the MCA Occupational Health Committee met in Montreal,

Canada to address the European researcher P.L. Viola's recent animal study findings of cancer.

Meeting attendees agreed this affected both VCM and PVC producers. Representing and acting

in their official capacity on behalf of their employers were:

(i)     B.F. Goodrich (W.E. McCormick),
(ii)    Olin (M.R. Gasque, M.D.),
(iii)   Gulf (J.J. Hogan, M.D.),
(iv)    Monsanto (M.N. Johnson, M.D.),
(v)     Union Carbide (K.S. Lane, M.D.),
(vi)    Minnesota Mining and Manufacturing (J.A. Pendergrass),
(vii)   Dow Chemical (T.R. Torkelson),
(viii)  Uniroyal (J.H. Wolfsie, M.D.),
(ix)    MCA (K.D. Johnson),
(x)     PPG (L.B. Grant, M.D.).

80. MCA members recognized that Dr. Viola's work produced cancer tumors from

exposures below 5,000 ppm, leading to the conclusion that 100 ppm would not prevent tumors.

Defendants agreed to fraudulently conceal this vinyl chloride danger and give no warnings to

workers, including plaintiff's decedent.

81. On November 16, 1971, the MCA held a vinyl chloride conference in Washington,

D.C., where participants noted that publication of Dr. Viola's work finding cancer in vinyl

chloride-exposed animals could cause serious problems for the U.S. industry and that publication

of the information should be suppressed. Representing and acting officially on behalf of their

32

employers were:

(i)     B.F. Goodrich (W.E. McCormick),
(ii)    Stauffer (M.V. Anthony),
(iii)   PPG (Z.G. Bell),
(iv)    Allied (J.C. Fedoruk),
(v)     Pantasote (J.P. Gabbett),
(vi)    Monsanto (M.N. Johnson),
(vii)   MCA (K.D. Johnson),
(viii)  Solvay American (R.W. Knoepful),
(ix)    Firestone (W.W. Madden),
(x)     General Tire and Rubber (J.R. Mudd),
(xi)    Conoco (S.F. Pitts),
(xii)   Tenneco (A.C. Siegel),
(xiii)  Allied (K.K. Sheth),
(xiv)   Air Products (W.M. Smith),
(xv)    Dow Chemical (T.R. Torkelson),
(xvi)   Union Carbide (R.N. Wheeler),
(xvii)  Shell (N.G. White).

82. On November 23, 1971, Union Carbide's R. N. Wheeler wrote a trip report of his attendance at the November 16, 1971 MCA Vinyl Chloride Conference. He reported that Dr. Viola had found tumors at exposures of less than 5,000 parts per million. Industry representative specifically recognized that publishing Dr. Viola's work in the U.S. could lead to serious problems with regard to the vinyl chloride monomer and resin industry so they agreed to keep the information secret.

83. The defendants recognized that they needed access to the European cancer research, but agreed that it should be kept secret and not disclosed to anyone beyond the MCA Vinyl Chloride Task Group. MCA then began to negotiate a secrecy agreement with the European VC companies.

84. On August 16, 1972, D. M. Powell, on behalf of the European vinyl chloride industry, wrote to MCA's G.E. Best and noted that they had worked out the terms of a secrecy

33

agreement to hold confidential European data regarding carcinogenicity of vinyl chloride.

85. On October 19, 1972, MCA's Kenneth Johnson wrote to defendants about the secrecy agreement with European researchers. Mr. Johnson stated that the members of the MCA's task group were the only ones entitled to receive information about the secret European project. The Agreement provided that the signatories would be entitled to receive information about cancers caused by vinyl chloride, but they could not disclose this information without the European's written consent. The members whose companies had signed the secrecy agreement were:

    (i)     Mayo Smith (Air Products),
    (ii)    W.A. Knapp (Allied),
    (iii)   Henry Schmidt (Borden),
    (iv)   Flynt Kennedy (Conoco),
    (v)    Ted Torkelson (Dow Chemical),
    (vi)   Bill Rinehart (Ethyl),
    (vii)   W.W. Madden (Firestone),
    (viii)  W.E. McCormick (B.F. Goodrich),
    (ix)   Elmer Wheeler (Monsanto),
    (x)    Roy Gasque (Olin),
    (xi)   Zeb Bell (PPG),
    (xii)   R.W. Maycock (Shell),
    (xiii)  N.V. Hendricks (Standard Oil New Jersey),
    (xiv)  A.B. Linquist (Stauffer Chemical),
    (xv)   Marvin Rosen (Tenneco Chemicals, Inc.),
    (xvi)  R. N. Wheeler (Union Carbide),
    (xvii) Walter Harris (Uniroyal).

86. In approximately November of 1972, B.F.Goodrich signed the secrecy agreement pledging to hold secret the results of a secret European animal study that found cancer from vinyl chloride exposure. As a result of this agreement, B.F. Goodrich became aware of more research data that clearly showed that vinyl chloride causes angiosarcoma of the liver, a rare form of liver cancer, in animals exposed to less than occupational levels. By this time, B.F. Goodrich already

34

had employees who were diagnosed with this cancer. B.F. Goodrich management continued to conceal the relationship between vinyl chloride and angiosarcoma of the liver from local plant doctors, its employees and employees of its customers.

87. On November 14, 1972, the MCA Technical Task Group on Vinyl Chloride Research met in Washington, D.C. and members were given the secret European information that VCM caused angiosarcoma of the liver in animals exposed to 250 ppm. Members representing and acting officially on behalf of their employers were:

        (i)     Air Products (W. Mayo Smith),
        (ii)    Allied (W.A. Knapp),
        (iii)   Borden (H.L. Schmidt, Jr.),
        (iv)    Conoco (Flynt Kennedy),
        (v)     Dow Chemical (T.R. Torkelson and C. Otis),
        (vi)    Ethyl (W.E. Rinehart),
        (vii)   B.F. Goodrich (W.E. McCormick),
        (viii)  PPG (Z.G. Bell, Jr.),
        (ix)    Shell (R.L. Maycock),
        (x)     Stauffer (M.V. Anthony),
        (xi)    Tenneco (A. Siegel),
        (xii)   Union Carbide (R.N. Wheeler),
        (xiii)  Uniroyal (W.D. Harris),
        (xiv)   MCA (G.E. Best and K.D. Johnson),
        (xv)    Representative from ICI (D.M. Elliott).

Members representing and acting officially on behalf of their employer, but not physically present were:

        (i)     Exxon (N.V. Hendricks),
        (ii)    Firestone (W.M. Madden),
        (iii)   Monsanto (E.P. Wheeler),
        (iv)    Olin (M.R. Gasque).

88. On January 4, 1973, Dow Chemical, at a time when executives at Dow knew of animal studies showing that vinyl chloride caused cancer in animals, issued its own Material Safety Data Sheet (MSDS) on vinyl chloride. Dow Chemical failed to mention that vinyl

35

chloride had been shown to cause cancer in animals. To the contrary, it simply referenced "dizziness and drunkenness, possibly lung irritation ... anesthetic effect." Dow Chemical's Torkelson, represented by counsel, admitted in sworn deposition testimony that Dow Chemical knew of the European cancer studies at the time it issued its MSDS that did not disclose a risk of cancer.

89. On January 30, 1973, the federal government formally requested the submission of unpublished information regarding vinyl chloride hazards. Defendants refused to provide responsive information and plotted on how best to deceive the federal government and not reveal the secret European information.

90. On January 30, 1973, the MCA Vinyl Chloride Research Coordinators met in Washington, D.C. where Dr. Torkelson of Dow Chemical, who had previously been dispatched to Europe to view the European studies, reported that the European research that found that vinyl chloride caused cancer was of high quality and that the results were undeniable. Immediately thereafter, in a press release regarding vinyl chloride issued by MCA, the companies deliberately refused to mention the subject of cancer. In addition, at the same meeting, it was recognized that vinyl chloride was a component of aerosols, but that industry could not stop selling vinyl chloride for aerosol use without risking disclosure of the cancer problem. The group specifically recognized that aerosols could result in unlimited liability to the U.S. population while liability to workers would be limited by Workman's Compensation. Members representing and acting officially on behalf of their employers were:

      (i)     Dow Chemical (T.R. Torkelson),
      (ii)    PPG (Z.G. Bell, Jr.),
      (iii)   Uniroyal (W.D. Harris),
      (iv)   Shell (R.L. Maycock),
      (v)    B.F. Goodrich (W.E. McCormick),

36

(vi)    Ethyl (W.E. Rinehart),
(vii)   Carbide (R.N. Wheeler, Jr.),
(viii)  ICI (D.P. Duffield),
(ix)    Exxon (N.V. Hendricks),
(x)     Goodyear (C.A. Johnson, M.D.),
(xi)    MCA staff member (G.E. Best).

91.  On February 1, 1973, B.F. Goodrich's W.E. McCormick wrote Anton Vittone with

copies to J.W. Miller, Jr., Vice President of B.F. Goodrich, Dr. R.W. Strassburg, Dr. Rex H.

Wilson, B.F. Goodrich Medical Director and Benjamin M. G. Zwicker, B.F. Goodrich Director.

McCormick said "I am convinced that if the present European information becomes known to

governmental agencies in the United States, and particularly to OCAW, URW and the [illegible]

vinyl chloride will be classed as a carcinogen."

92.  Despite the above, on February 28, 1973, after learning that ACGIH intended to

lower the TLV for vinyl chloride, B.F. Goodrich's W.E. McCormick, in furtherance of their

underlying fraudulent behavior, wrote an internal memorandum to D.L. Dowell, B.F. Goodrich's

Manager of Safety.  Mr. McCormick stated "the present OSHA level is 500 ppm (ceiling).

Regardless of what ACGIH does, we should go with the OSHA level."  At this time, B.F.

Goodrich already had the secret European data showing cancer in animals exposed to vinyl

chloride at 250 ppm.  B.F. Goodrich withheld this information from OSHA, its workers, its

customers and their employees, including plaintiff's decedent.

93.  Prior to March 5, 1973, each of the following had signed the secrecy agreement

requiring them not to disclose the carcinogenicity of vinyl chloride:

(i)     Air Products,
(ii)    Allied Chemical,
(iii)   Borden Chemical,
(iv)    Conoco,
(v)     Diamond,
(vi)    Dow Chemical,

37

(vii)     Ethyl,
(viii)    Exxon,
(ix)      Firestone,
(x)       B.F. Goodrich,
(xi)      Goodyear,
(xii)     Monsanto,
(xiii)    Olin,
(xiv)     PPG,
(xv)      Shell,
(xvi)     Stauffer,
(xvii)    Tenneco,
(xviii)   Union Carbide
(xix)     Uniroyal.

94. On May 21, 1973, B.F. Goodrich and other members of the MCA Vinyl Chloride

Research Coordinators met to discuss their obligations under the secrecy agreement. They

admitted that the actions of MCA they had authorized could be construed as an illegal conspiracy

among industry if information were not made public or at least made available to the

government. Nonetheless, the information about vinyl chloride causing cancer continued to be

fraudulently concealed. Representing and acting officially on behalf of their employers were:

(i)       Dow Chemical Company (T.R. Torkelson),
(ii)      Tenneco Chemicals, Inc. (T.R. Aalto),
(iii)     PPG Industries (Z.G. Bell, Jr.),
(iv)      Stauffer Chemical Company (F.J. Doyle),
(v)       B.F. Goodrich (M.N. Johnson, M.D.),
(vi)      Continental Oil Company (Flynt Kennedy),
(vii)     Allied Chemical (W.A. Knapp),
(viii)    Diamond Shamrock (R.W. McBurney, M.D.),
(ix)      Firestone Plastics (W.W. Madden),
(x)       Shell Chemical (R.L. Maycock),
(xi)      Ethyl Corporation (W.E. Rinehart),
(xii)     Air Products & Chemicals (W.M. Smith),
(xiii)    Union Carbide (R.N. Wheeler),
(xiv)     MCA (B.M. Barackman, esq., A.C. Clark, K.D. Johnson).

95. On July 17, 1973, the vinyl chloride manufacturers listed below met with NIOSH's

Director, Marcus Key.   Prior to the meeting the defendants agreed not to disclose their

38

knowledge of the carcinogenicity of vinyl chloride as demonstrated in the European research. At the meeting, defendants presented SD-56 as representing the position of MCA and its members regarding the hazards of vinyl chloride, despite their knowledge that vinyl chloride was substantially more hazardous than the information defendants intentionally included in SD-56. They did not disclose the vinyl chloride cancer information they had obtained under the secrecy agreement.

> (i)    Ethyl (Dr. W.E. Rinehart),
> (ii)   Dow Chemical Chemical (V.K. Rowe),
> (iii)  Union Carbide (R.N. Wheeler),
> (iv)   MCA (George E. Best).

96. On December 13, 1973, Dow Chemical's D.A. Raush wrote to a Dow Chemical scientist that he approved the release of a paper concerning the effect of exposure of rats to vinyl chloride except that "all references to Dr. Maltoni's work and its findings of carcinogenicity and his results should be deleted" and "release of data is to be limited to those companies supporting the MCA studies on vinyl chloride." In addition, the information was to be marked "Dow confidential."

97. On January 23, 1974, B.F. Goodrich issued a press release about the deaths of three employees in its polyvinyl chloride operations at Louisville who died of angiosarcoma. The press release did not mention the Maltoni data that defendants had fraudulently concealed and which had shown this very type of cancer in animals exposed to vinyl chloride back in November 1972.

98. On February 15, 1974, OSHA held an informal hearing in which B.F. Goodrich's Anton Vittone was called to testify. Mr. Vittone falsely represented that Viola's work had demonstrated cancers at 30,000 ppm when B.F. Goodrich was well aware that tumors were

39

found at levels less than 5,000 ppm. Vittone failed to mention that B.F. Goodrich had received secret information concerning the relationship between vinyl chloride and angiosarcoma of the liver in November of 1972, or any of the earlier information that B.F. Goodrich had collected about vinyl chloride causing liver damage. Additionally, representatives of defendant MCA admitted that the MCA produced SD-56 for its members to represent warnings to all users of vinyl chloride, including plaintiff's decedent.

99. On March 1, 1974, Dr. Maltoni finally published his findings on vinyl chloride and animal testing and revealed his study findings, which demonstrated that vinyl chloride was capable of causing various types of cancer in animals including angiosarcomas. This information had been kept secret since November of 1972.

100. On March 16, 1974, Dr. Creech, the local B.F. Goodrich Louisville plant physician, and Dr. Maurice Johnson, Corporate Medical Director of B.F. Goodrich, published a case report on angiosarcoma in the Journal of Occupational Medicine. The article contained an editor's note concerning Maltoni telling OSHA about his finding in 1972 of angiosarcoma of the liver in animals exposed to vinyl chloride. Dr. Creech, B.F. Goodrich's Louisville plant physician, first learned of Maltoni's work when he read the editor's note that had been added to his 1974 article. Although Dr. Creech had been charged with protecting workers at the B.F. Goodrich's Louisville facility, Dr. Creech was not told in November of 1972 of Maltoni's findings. Dr. Creech said he had previously diagnosed angiosarcoma in a B.F. Goodrich worker exposed to vinyl chloride, but he did not have any reason to suspect that it had been caused by vinyl chloride. Clearly B.F. Goodrich intentionally hid from its own local physicians charged with the care of its workers, the information that vinyl chloride had long been linked to angiosarcoma of the liver.

40

101. On June 5, 1974, industry members met with the European scientist Cesare Maltoni (University Bologna) in New York, N.Y.  The meeting was highly confidential and personal and no notes or memos were allowed.  The group learned of Maltoni's findings of injuries and tumors at 50 ppm.  Present at this meeting were:

    (i)      Ethyl (Jim Bergan, Bill Rinehart, Mr. Sobel, Roy Wilkins and M.R. Zavan),
    (ii)     B.F. Goodrich (Maurice Johnson),
    (iii)    Dow Chemical (Ted Torkelson),
    (iv)    Union Carbide (Kenneth S. Lane),
    (v)     Uniroyal (Walt Harris),
    (vi)    Air Products (Mayo Smith),
    (vii)   Shell (Howard Kusnetz),
    (viii)  Solvay (Auguste Gosselin).

102. On December 12, 1974, the MCA Technical Task Group on Vinyl Chloride Research met in Washington, D.C.  At this meeting, the status of the European secrecy agreement was discussed.  It was specifically noted that the agreement remained in effect.  Representing and acting officially on behalf of their employers were:

    (i)      Dow Chemical (T.R. Torkelson),
    (ii)     Hooker (R.J. Abramowitz),
    (iii)    Georgia Pacific (P.L. Armstrong),
    (iv)    PPG (Z.G. Bell, Jr.),
    (v)     Firestone (R.S. Brookman),
    (vi)    Exxon (R.E. Exkardt, M.D.),
    (vii)   Allied (W.S. Ferguson),
    (viii)  Great American (A.W. Fuhrman),
    (ix)    Uniroyal (W.D. Harris),
    (x)     B.F. Goodrich (M.N. Johnson, M.D.),
    (xi)    Conoco (Flynt Kennedy),
    (xii)   Diamond Shamrock (Albert Kover),
    (xiii)  Shell (H.L. Kusnetz),
    (xiv)  Goodyear (C.A. Johnson, M.D.),
    (xv)   Ethyl (W.E. Rinehart),
    (xvi)  Borden (H.L. Schmidt, Jr.),
    (xvii) Tenneco (David Smalley),
    (xviii) Air Products (W.M. Smith),

41

(xix)   Union Carbide (R.N. Wheeler),
(xx)    MCA staff (Milton Freifeld, K.D. Johnson and Samuel Watts), among others.

**Agreement to fraudulently misrepresent the "odor threshold" of vinyl chloride in order to misrepresent exposures to vinyl chloride.**

103.    The "odor threshold" is the concentration or level of exposure at which a human can smell a chemical. The defendants have made false and contradictory statements to continuously mislead workers into believing they faced no toxic hazard from vinyl chloride.

104.    Prior to the early 1970's when the workers were being told that they were free from hazard because the safe level of exposure to vinyl chloride was 500 ppm, the workers were also told that the odor threshold was at 250 ppm and the fact that they smelled VC was no indication of danger. In later years, when some of the hazards of vinyl chloride were revealed, the employers told their workers that the cancer risk had been eliminated from the workplace because the cancers were caused by past exposures that were very high.

105.    Defendants repeatedly informed workers and published documents stating that the odor threshold for vinyl chloride was approximately 250 ppm. Thus, if a worker smelled vinyl chloride, the worker would believe that the exposure was below the 500 ppm TLV.

106.    Firestone repeatedly informed plaintiff's decedent and his co-workers during the course of his employment prior to 1975 that the odor threshold for vinyl chloride was approximately 250 ppm.

107.    In a June 21, 1968 B.F. Goodrich memorandum to Fred Krause, J.G. DiSalvo acknowledged that the odor threshold for vinyl chloride was 4,100 ppm.

108.    When B.F. Goodrich finally conducted its own test for the vinyl chloride odor threshold in 1974, the lowest level at which the most sensitive subject could detect the vinyl

42

chloride was 2,000 ppm.

109. Yet, as late as April 1, 1975, a B.F. Goodrich memorandum still informed workers that the odor threshold was 260 ppm at the Avon Lake plant. This same information was provided to workers at the Point Pleasant plant where plaintiff's decedent worked, thereby fraudulently concealing the truth.

## CAUSES OF ACTION

### COUNT I
### Strict Liability: Intentional and/or Negligent Failure to Warn vs. Manufacturer/Supplier Defendants

110. Plaintiff incorporates by reference all of the allegations of this pleading as if fully rewritten herein.

111. Each Manufacturer/Supplier defendant designed, formulated, created, made, manufactured, processed, produced, sold, distributed, prepared, blended, packaged, labeled and/or otherwise put into the stream of commerce, the vinyl chloride to which plaintiff's decedent was exposed during the course of his employment, and which the Manufacturer/Supplier defendants knew, or in the exercise of ordinary care should have known, were highly hazardous to the health and well-being of workers, including the plaintiff's decedent.

112. Each Manufacturer/Supplier defendant knew that its vinyl chloride contained latent defects and was defective, dangerous, harmful and unsafe for its intended use,

113. At all relevant times the Manufacturer/Supplier defendants had actual and constructive knowledge that their vinyl chloride was capable of causing severe injuries and death when used in a manner consistent with its intended and foreseeable purpose and use.

114. At all times material hereto the Manufacturer/Supplier defendants knew that the

43

vinyl chloride which they manufactured and/or supplied to the Firestone plant was inherently and unreasonably dangerous and defective when used in the intended and reasonably foreseeable manner, and that adequate warnings were needed to protect these workers against foreseeable injury from exposure to this product.

115. At all times material hereto the Manufacturer/Supplier defendants knew that Walter Scibek and other similarly situated chemical workers, during the usual course of their employment, and through the ordinary foreseeable use of the vinyl chloride, would on a regular basis be exposed to and would inhale, absorb and ingest vinyl chloride fumes and vapors.

116. At all times material hereto the Manufacturer/Supplier defendants knew that Firestone was not providing their employees, including Walter Scibek, with accurate, complete or adequate warnings about vinyl chloride hazards.

117. The latent defects and unsafe condition of each Manufacturer/Supplier defendant's vinyl chloride supplied to the Firestone plant created a duty to warn users, including plaintiff's decedent, of the latent defects and unsafe conditions of the products.

118. At all times material hereto, the Manufacturer/Supplier defendants owed a duty of due and reasonable care to Walter Scibek and other similarly situated persons to provide them with accurate and complete warnings about the dangers of vinyl chloride, including chronic health hazards resulting from long-term exposures to vinyl chloride. The Manufacturer/Supplier defendants failed to assure that such warnings accompanied the vinyl chloride or were provided to Walter Scibek and his fellow workers.

119. The Manufacturer/Supplier defendants breached their duty of due and reasonable care by the following conduct: a) failing to properly test and investigate the dangers posed to chemical workers such as Walter Scibek by their vinyl chloride products; and b) failing to

44

provide proper, adequate and correct warnings and instructions for proper and safe use concerning the dangers posed to the persons using, handling or exposed to their vinyl chloride products.

120. The Manufacturer/Supplier defendants intentionally breached their duty to warn plaintiff's decedent in one, some or all of the following respects, among others, and this breach of duty was a proximate cause of plaintiff's decedent's illness and death:

   a.   by failing to timely and adequately warn plaintiff's decedent of the dangerous characteristics and serious health hazards associated with exposure to vinyl chloride;

   b.   by failing to provide plaintiff's decedent with information as to what would be reasonably safe and sufficient wearing apparel and proper personal protective equipment and appliances to protect plaintiff's decedent from being harmed by exposure to vinyl chloride;

   c.   by failing to send timely and adequate warnings with containers of vinyl chloride to warn plaintiff's decedent of the dangers to his health from coming into contact with vinyl chloride; and

   d.   by failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and/or safe method of handling vinyl chloride.

121. As a direct and proximate result of the Manufacturer/Supplier defendants' breach of duty to warn, plaintiff's decedent suffered serious illness, physical and emotional pain and suffering, and ultimately prematurely died of hepatic angiosarcoma.

122. As a direct and proximate result of the Manufacturer/Supplier's failure to warn, Barbara Scibek, plaintiff's decedent's children suffered the damages set forth in greater detail in the Wrongful Death and Srvival Action Counts below.

WHEREFORE, plaintiff, Barbara Scibek, Executrix of the Estate of Walter Scibek, Deceased, demands judgment in her favor and against manufacturer defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) including

45

delay damages, interest and allowable costs of suit and bring this action to recover same.

## COUNT II
### Fraud vs. Manufacturer/Supplier Defendants

123. Plaintiff incorporates herein by reference all of the allegations of this pleading as if fully rewritten herein.

124. The Manufacturer/Supplier defendants knew and possessed medical and scientific data and other information which clearly established that vinyl chloride was hazardous to the health and safety of plaintiff's decedent and persons like plaintiff's decedent whose employment responsibilities exposed them to vinyl chloride.

125. The Manufacturer/Supplier defendants knew and fraudulently concealed that plaintiff's decedent's exposure to vinyl chloride posed a great risk of him developing cancer or disease subsequent to his exposure, and failed to properly advise or inform plaintiff's decedent of this danger.

126. The Manufacturer/Supplier defendants knew that plaintiff's decedent and persons like plaintiff's decedent whose employment responsibilities exposed them to vinyl chloride did not know, or possess the information to know, that vinyl chloride is very hazardous to their health and safety.

127. With the intent to deceive the government, the general public, and workers, including plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride, and with the intent that these persons and entities were and should remain ignorant of such medical and scientific data, and with the further intent to induce them to alter their position so as to be subject to injury and/or increased risk, and in order to gain an economic advantage, the Manufacturer/Supplier defendants made material misrepresentations of fact, concealed

46

material facts where they had a duty to disclose such facts, and presented as fact matters which

they either knew to be false or knew could not be established as fact.

128.  The misrepresentations and concealment of material facts included the following:

a.  The Manufacturer/Supplier defendants deliberately caused to be presented as a matter of fact to workers, including plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride that it was safe for said persons to work with and in proximity to such materials;

b.  The Manufacturer/Supplier defendants deliberately failed to recommend to workers, including plaintiff's decedent, the use of respirators and other personal protective equipment when they were required to work in areas where they would be exposed to the Manufacturer/Supplier defendants' VCM even though the Manufacturer/Supplier defendants knew that such protective measures were necessary and that if such protective devices were not used it would result in injury to and the death of said persons;

c.  The Manufacturer/Supplier defendants deliberately concealed from workers, including Plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride the true nature of industrial exposure to vinyl chloride, in that the Manufacturer/Supplier defendants knew that VCM would be released in the polymerization process and while cleaning reactors and that upon inhalation of vinyl chloride, workers who were exposed to vinyl chloride were at risk of developing cancer and dying;

d.  The Manufacturer/Supplier defendants deliberately concealed from workers, including plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride the fact that vinyl chloride would cause pathological effects without noticeable trauma;

e.  The Manufacturer/Supplier defendants deliberately failed to provide medical and scientific information to the government, the medical community, workers, including plaintiff's decedent, and the public at large as to the true nature of hazards of vinyl chloride and actively concealed material medical and scientific facts, including the true odor threshold of vinyl chloride;

f.  The Manufacturer/Supplier defendants deliberately failed to provide workers, including plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride with reasonable safe operating instructions, policies and procedures; and

g.  The Manufacturer/Supplier defendants deliberately suppressed damaging research data and manufactured fraudulent science regarding the health effects of exposure to vinyl chloride.

129. The Manufacturer/Supplier defendants had a duty to users of their vinyl chloride, including workers such as Plaintiff's decedent whose employment responsibilities exposed them to vinyl chloride, to reveal the full nature and extent of the dangers of vinyl chloride.

130. The Manufacturer/Supplier defendants knowingly and fraudulently misrepresented and concealed the dangers of vinyl chloride from the government, the medical community, the general public and workers, including plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride.

131. The Manufacturer/Supplier defendants engaged in said fraudulent concealment and misrepresentations because they knew that to do otherwise would invoke fear and apprehension in persons who would be exposed to vinyl chloride, would cause the government to develop more stringent regulations regarding vinyl chloride and would ultimately result in a decrease in sales of and profits from vinyl chloride.

132. The facts fraudulently concealed and misrepresented by the Manufacturer/Supplier defendants were material to plaintiff's decedent's decision to work with, near and/or be exposed to vinyl chloride.

133. Said fraudulent concealment and representations were made by the Manufacturer/Supplier defendants with the intent to deceive and mislead and to be relied upon by workers, including plaintiff's decedent, whose employment responsibilities exposed them to vinyl chloride.

134. Plaintiff's decedent relied upon said misrepresentations to his detriment and this reliance was reasonable and justified. For example, the plaintiff's decedent relied, directly or indirectly, to his detriment, upon SD-56, the materially false safety data sheet, supplied by the

defendants. Plaintiff's decedent also relied, to his detriment, upon other statements made and documents provided to him by defendants and Firestone indicating that his work was safe and that there was no risk of cancer from his vinyl chloride exposures.

135. As a direct and proximate result of the Manufacturer/Supplier defendants' fraudulent concealment and misrepresentations, plaintiff's decedent, during the course and scope of his employment, was exposed to toxic levels of vinyl chloride, which directly and proximately caused him to develop hepatic angiosarcoma.

WHEREFORE, plaintiff, Barbara Scibek, Executrix of the Estate of Walter Scibek, Deceased, demands judgment in her favor and against manufacturer defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) including delay damages, interest and allowable costs of suit and bring this action to recover same.

## COUNT III
### Strict Liability in Tort of Manufacturer/Supplier Defendants

136. Plaintiff incorporates by reference all of the allegations of this pleading as if fully rewritten here.

137. Plaintiff's decedent was exposed to vinyl chloride that was manufactured and/or supplied by the Manufacturer/Supplier defendants and/or their predecessors-in-interest for use in industrial operations.

138. The Manufacturer/Supplier defendants are engaged in the business of selling vinyl chloride, and plaintiff's decedent was exposed to these defendants' vinyl chloride without substantial change in the condition in which it was sold, and with the defects existing at the time the product left the hands of the defendants.

49

139.  The vinyl chloride supplied by the Manufacturer/Supplier defendants was in a defective condition at the time it left the hands of defendants because it was not of good and merchantable quality fit and safe for its use; was unreasonably dangerous for its intended uses; and because defendants failed and refused to provide accurate, complete or adequate warnings of vinyl chloride health hazards.

140.  During the period of time that plaintiff's decedent was exposed to the vinyl chloride of the Manufacturer/Supplier defendants, the VCM was being utilized in a manner that was intended by and reasonably foreseeable to defendants.

141.  The Manufacturer/Supplier defendants knew or should have known that their vinyl chloride would be used without accurate, adequate or complete warnings being provided by plaintiff's decedent's employers.

142.  By placing the vinyl chloride products in the market, these defendants represented that it would safely do the job for which it was intended.

143.  Plaintiff's decedent was unaware of the hazards and defects in the vinyl chloride of the Manufacturer/Supplier defendants that made it unsafe for purposes of processing and use.

144.  Plaintiff's decedent worked with and in close proximity to the Manufacturer/Supplier defendants' vinyl chloride, and his presence was known to, or ought to have reasonably been anticipated by, the Manufacturer/Supplier defendants.

145.  The Manufacturer/Supplier defendants are strictly liable for the manufacture and sale of defective vinyl chloride that proximately caused the injury to and death of plaintiff's decedent,

146.  As a direct and proximate result of the Manufacturer/Supplier defendants' manufacture and sale of defective products, , plaintiff's decedent suffered serious injuries,

50

serious illness, physical and emotional pain and suffering, and ultimately and prematurely died of hepatic angiosarcoma.

147. As a direct and proximate result of the Manufacturer/ Supplier defendants' manufacture and sale of defective products Barbara Scibek, plaintiff's decedent's children and his other next of kin sustained damages including, but not limited to, those for sorrow, mental anguish, and solace, including society, companionship, comfort, guidance, kindly offices and advice of the decedent; compensation for reasonably expected loss of services, protection, care and assistance provided by the decedent; expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; reasonable funeral expenses; compensation for pain and suffering and loss of enjoyment of life prior to decedent's death, and all other damages as provided for in Pennsylvania survivorship and wrongful death actions.

148. The Manufacturer/Supplier defendants are strictly liable for the injury to and death of plaintiff's decedent proximately caused by his exposure to their vinyl chloride.

WHEREFORE, plaintiff, Barbara Scibek, Executrix of the Estate of Walter Scibek, Deceased, demands judgment in her favor and against manufacturer defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) including delay damages, interest and allowable costs of suit and bring this action to recover same.

## COUNT IV

### Concert of Action and Civil Conspiracy to Commit Tortious Conduct By All Defendants

149. Plaintiff incorporates by reference all of the allegations of this pleading as if fully rewritten here.

150. All of the defendants, including the Manufacturer/Supplier defendants and the

51

Conspiracy defendants, entered into a conspiracy with each other and with Firestone that by common design and mutual understanding was intended to accomplish unlawful ends and/or to reach lawful ends by unlawful means. Part of this conspiracy involved the defendants, individually and collectively with Firestone, failing and refusing to give warnings about the true dangers of vinyl chloride; concealing or manipulating technical, medical and scientific information so as to not have to disclose the true dangers of vinyl chloride; failing and refusing to conduct essential research, knowing that the results, if disclosed, would prove that vinyl chloride was a deadly carcinogen; and attempting to delay adoption of standards that would protect exposed workers from the dangers of vinyl chloride.

151. The conspiracy among defendants was intended to misrepresent and conceal material facts about the nature and extent of the risks of exposure to vinyl chloride and vinyl chloride-containing products from workers, including plaintiff's decedent.

152. The conspiracy involved the common design and mutual understanding among all defendants that the co-conspirators would fraudulently misrepresent and/or conceal material facts about the nature and extent of the risks of vinyl chloride from workers, including employees of the defendants.

153. All of the defendants conspired to intentionally misrepresent and conceal the hazards of vinyl chloride from plaintiff's decedent; intentionally not provide safe practices and procedures to protect Mr. Scibek from the dangers of vinyl chloride exposure; and to otherwise intentionally engage in tortious conduct, all of which proximately caused the injuries to and death of Walter Scibek.

154. All of the defendants conspired to commit fraud, proximately causing the injuries to and death of Walter Scibek.

52

155. The conspiracy to engage in tortious misconduct included:

    a. fraudulently misrepresenting, suppressing and concealing information relating to the hazards of vinyl chloride;

    b. consciously, knowingly, intentionally, and willfully disregarding an obvious and imminent danger of serious injury or death to persons exposed to vinyl chloride, including plaintiff's decedent;

    c. failing and refusing to take precautions to avoid reasonably foreseeable injuries to workers, including plaintiff's decedent, who would be exposed to defendants' products;

    d. intentionally permitting the overexposure of plaintiff's decedent to vinyl chloride without his informed consent.

    e. agreeing to misrepresent that 500 ppm was a safe exposure limit when defendants knew that was not a fact; and

    f. agreeing not to study health effects from vinyl chloride exposure in a timely manner.

156. Although plaintiff's decedent voluntarily went to work, he was unaware of the true dangers associated with vinyl chloride exposure and was unaware of the true nature and extent of the risks associated with working in areas contaminated with vinyl chloride.

157. The following overt tortious acts were committed against plaintiff's decedent by one or more of the defendants and/or Firestone in furtherance of their conspiracy:

    a. exposing plaintiff's decedent to hazardous levels of vinyl chloride without his knowledge or informed consent;

    b. failing and refusing to provide adequate industrial hygiene controls and personal protective equipment to reduce or eliminate the dangerous effects of vinyl chloride;

    c. failing and refusing to provide adequate warnings regarding the dangers and health effects of exposure to vinyl chloride, and the odor threshold;

    d. failing and refusing to reasonably test or investigate the dangerous propensities associated with vinyl chloride;

    e. participating in an industry-wide effort to fail and refuse to reasonably test or investigate the potential adverse health effects posed by the use of vinyl chloride in

53

the work-place, including the concerted effort to misrepresent, misclassify, alter, and suppress epidemiological and toxicological studies, data, and other information concerning the toxicity of vinyl chloride;

f.  participating in an industry-wide effort to consciously fail to protect plaintiff's decedent, and other workers whose employment responsibilities exposed them to vinyl chloride of potential cancers, vinyl chloride disease, and other ill health effects associated with exposure to vinyl chloride, including misrepresentation, misclassification, alteration, and suppression of epidemiological and toxicological studies, data, and other information relating to the toxicity of vinyl chloride;

g.  participating in an industry-wide effort to improperly influence, manipulate, alter, and misclassify epidemiological and toxicological data and scientific findings as reported by research concerning the health risks of vinyl chloride in the medical and trade literature;

h.  participating in an effort to suppress knowledge concerning the toxicity and carcinogenicity of vinyl chloride that could be obtained by workers exposed to vinyl chloride, the government, and the general public;

i.  participating in a concerted effort to continue the manufacture, marketing and distribution of a knowingly defective product;

j.  falsely stating that 500 ppm was a safe exposure level when this was known not to be a fact.

158. The defendants carried out their conspiracy in part by acting through the following organizations:

a.  The Manufacturing Chemists Association ("MCA") Ad Hoc Planning Group for vinyl chloride Research; MCA Environmental Health and Advisory Committee; MCA Executive Committee; MCA General Safety Committee; MCA IH and Monitoring Sub-Task Group; MCA Labels and Precautionary Committee; MCA Medical Advisory Committee; MCA Occupational Health Committee ("MCA OHC"); MCA Plastics Committee; MCA Safety and Fire Protection Committee; MCA VC Research Coordinators; VC Conference - 11/16/71; MCA Presentation to EPA - 4/2/74; and

b.  The MCA or Chemical Manufacturers Association ("CMA") Vinyl Panel, which includes: MCA Technical Task Group on VC Research; MCA Tech Panel for VC Research; CMA VC Project Panel; CMA VC Industry Representative Committee; CMA VC Program Panel; CMA VC Panel; CMA VC Health Committee; Special Projects Advisory Group; Special Programs Advisory Committee; Special Programs Review Committee; Special Programs Policy Committee; PVC Producers; PVC Resin Producers; vinyl chloride Safety

54

Association; The Society of Plastics Industry, Inc. ("SPI") VI Health Safety & Environment Committee; SPI Public Affairs Committee; and SPI VCM & PVC Producers Group.

**The conspiracy perpetrated the fraud that VC was harmless at exposures below 500 parts per million (ppm) through the creation, publication and dissemination of SD-56.**

159. In 1953, the MCA, along with the active participation of the CMA Vinyl Panel and the MCA OHC, produced a chemical safety data sheet for vinyl chloride monomer known as SD-56 which stated that the injury hazard of vinyl chloride monomer was from explosion, fire and frostbite burns, that there were no hazards when exposures were below 500 ppm, and that above 500 ppm the only hazard was an anesthetic effect.

160. The defendants and Firestone by agreement disseminated SD-56 to be used throughout the vinyl chloride industry and to be relied upon by employers, including plaintiff's-decedent's employer, employees in the industry, including plaintiff's decedent, and customers. Defendants and Firestone intended and agreed that the information in SD-56 would be the only information given to employees, customers and workers.

161. Despite having specific knowledge that statements and representations set forth in the SD-56 were false, incomplete and omitted material facts, Defendants and Firestone continued to promote SD-56 throughout the 1950s, 1960s and 1970s. The specific knowledge of the defendants included, but is not limited to the following:

   a. The earliest studies in the 1930's and 1940's showed liver damage from exposure to vinyl chloride;

   b. Reports from Europe in the 1940's and 1950's indicated vinyl chloride workers developed liver damage;

   a. As early as the 1950s, workers exposed to vinyl chloride had idiosyncratic injuries that were peculiar to vinyl chloride exposure;

   d. The defendants' own experiments on animals showed that animals were injured when exposed to concentrations of vinyl chloride as low as 50 ppm;

55

e. Studies done in Europe in 1964, 1969 and 1970, and secretly provided to the conspiring defendants showed injuries to workers exposed to vinyl chloride; and

f. By 1965 vinyl chloride was known to be a hepatotoxin.

162.    The following entities agreed to make and participate in false statements or to substantially assist regarding the false and fraudulent SD-56 Chemical Data Sheet:

- Air Products
- The American Chemistry Counsel
- Borden
- Firestone
- Conoco
- Dow Chemical
- Ethyl
- B.F. Goodrich
- Goodyear
- Honeywell (Allied Chemical)
- Monsanto
- Occidental
- Olin
- PPG, Inc.
- Rhone-Polenc
- Shell
- Tenneco
- Union Carbide
- Uniroyal
- Zeneca

## The conspiracy to conduct fraudulent medical examinations, experiments and studies.

163.  Beginning in the 1950's and continuing into the 1980's, the defendants conducted medical tests on their own workers, including the plaintiff's decedent, and concealed from the workers the purpose of the testing and the nature of the findings. In addition, defendants failed to tell employees about the injuries caused by vinyl chloride found in company examinations, and the causes of the workers' injuries.

164. The following entities agreed to fraudulently conceal and affirmatively misrepresent the results of medical testing on vinyl chloride workers:

- Air Products
- Chemical Manufacturers Association
- Borden
- Firestone
- Conoco
- Dow Chemical
- Ethyl
- Gencorp
- Georgia Pacific
- B.F. Goodrich
- Goodyear
- Honeywell (Allied Chemical)
- Monsanto
- Occidental
- Olin
- PPG, Inc.
- Rhone-Polenc
- Shell
- Tenneco
- Union Carbide
- Uniroyal
- Zeneca

165. In the mid-1960s and continuing through the 1980s, the defendants agreed to assist in the publication of scientific studies that they had designed and altered to conceal the hazards of vinyl chloride.

166. Beginning in the early 1970s, the defendants commissioned and controlled a series of epidemiological studies to fraudulently conceal the extent of cancers caused by vinyl chloride. The initial corruption of the databases was recognized by subsequent contractors hired to perform further analysis or updates of this same cohort. To fraudulently conceal the extent of cancer caused by vinyl chloride, the conspiring defendants made sure that certain plants were studied in a way that was inconsistent with how other plants were studied; that persons who were

not independent and impartial were allowed to shuffle employees in or out of the cohort or shuffle employees' exposure classifications without any review or factual justification; and that, even in the 1980s, completely non-independent employees like plant managers or personnel officers were allowed to classify members of the cohort one way when they were alive and another way when they were dead. Defendants knew that their scientific studies were, and intended them to be, false and misleading

167. The following entities agreed to conduct fraudulent scientific studies and to manipulate data so as to minimize and misrepresent the known harm of exposure to vinyl chloride:

- Air Products
- Chemistry Manufacturers Association
- Borden
- Firestone
- Conoco
- Dow Chemical
- Ethyl
- Gencorp
- Georgia Gulf
- Georgia Pacific
- B.F. Goodrich
- Goodyear
- Gulf Oil
- Monsanto
- Occidental
- Olin
- PPG Inc.
- Rhone-Polenc
- Shell
- Tenneco
- Union Carbide
- Uniroyal
- Zeneca

### The conspiracy to enter into a secrecy pact regarding the carcinogenicity of VC.

168. The defendants agreed to conceal their knowledge of the carcinogenicity of vinyl

58

chloride from plaintiff's decedent, vinyl chloride workers and fabricators, the United States Government and the public at large.

169. A written "Secrecy Agreement" was entered into among American vinyl chloride producers and the sponsors of the European cancer research, Solvay et Cie, Imperial Chemicals Industries (ICI), and other European vinyl chloride manufacturers.

170. By September 20, 1972, the defendants agreed to the "Secrecy Agreement" which their agent, MCA, had negotiated on their behalf. By the end of 1972, each American vinyl manufacturer who belonged to the MCA vinyl panel had signed a "direct pledge" of secrecy. Additionally, every company that was allowed to participate in any of the meetings in which the secret European findings were discussed also signed or made such a secrecy agreement. The companies on the CMA Vinyl Panel who were parties to this particular secrecy agreement included: Air Products and Chemical Co., Allied Chemical Company, Borden Chemical Div. of Borden, Inc., Conoco, Dow Chemical Company, Ethyl Corporation, B.F. Goodrich Company, PPG, Inc. Chemical Division, Shell Chemical Company, Tenneco Chemicals, Inc., Stauffer Chemical Company, Union Carbide Corporation, Uniroyal, Inc., MCA, and ICI Mond Division. The Vinyl Chloride Research Coordinators were representatives from B.F. Goodrich Company, Dow Chemical Company, Ethyl Corporation, PPG Industries, Inc. Chemical Division, Shell Chemical Company, Union Carbide Corporation, MCA, and ICI Mond Division.

171. In furtherance of their conspiracy and fraud, every company that signed the secrecy agreement destroyed it to conceal the defendants' prior misconduct, with the following three exceptions: Conoco, Dow Chemical Company, and Monsanto Company. Further, as part of a continuing conspiracy, MCA and CMA (now known as the ACC) have completely destroyed all copies of the secrecy agreements they solicited.

59

172. Defendants by agreement concealed their knowledge of the carcinogenicity of vinyl chloride by, among other things:

   b. concealing the existence of studies discussed in their own meetings;

   c. concealing their knowledge of the Italian studies by Maltoni and Viola showing that vinyl chloride caused cancer in laboratory animals;

   d. concealing from the United States government their knowledge of studies showing vinyl chloride caused cancer (in response to requests from OSHA and NIOSH requesting all knowledge of the defendants about the toxicity of vinyl chloride);

   e. concealing from plaintiff's decedent and all other vinyl chloride workers and fabricators the true results of their own studies.

173. The conspiracy among defendants was intended to misrepresent and conceal material facts about the nature and extent of the risks of exposure to vinyl chloride and vinyl chloride-containing products from plaintiff's decedent and all other vinyl chloride workers and fabricators.

174. The conspiracy involved the common design, substantial assistance and mutual understanding among all the conspiring defendants that the co-conspirators would misrepresent and conceal material facts about the nature and extent of the risks of vinyl chloride and vinyl chloride-containing products from workers, including plaintiff's decedent and employees of the conspiring defendants and employees of customers.

175. The following entities agreed to conceal the carcinogenicity of VC:

- ☐ Air Products
- ☐ CMA
- ☐ Borden
- ☐ Firestone
- ☐ Conoco
- ☐ Dow Chemical
- ☐ Ethyl
- ☐ Gencorp
- ☐ Georgia Pacific
- ☐ Goodrich

60

☐ Goodyear
☐ Gulf Oil
☐ Honeywell
☐ Monsanto
☐ Occidental
☐ Olin
☐ PPG
☐ Rhone-Polenc
☐ Shell
☐ Tenneco
☐ Union Carbide
☐ Uniroyal
☐ Zeneca

**The conspiracy to use measurement techniques that were known to produce inaccurate results that falsely underreported the level of VC in the workplace and agreement to misrepresent the odor threshold for VC.**

176. Defendants knowingly and intentionally exposed plaintiff's decedent and other vinyl chloride workers to dangerous levels of vinyl chloride by falsely underreporting vinyl chloride exposure levels. Defendants knew that the devices they were using to measure VC exposures to workers underestimated the actual levels of VC in the workers exposure. Defendants continued to use faulty measurement devices and under-reported exposures even though the techniques for accurately measuring exposures were available.

177. Defendants knowingly and intentionally misrepresented the "odor threshold" in order to misrepresent exposures and injuries from VC. They deliberately claimed that the odor threshold was below what Defendants claimed were safe exposures.

178. When defendants finally admitted that vinyl chloride was harmful at levels below those that they had previously claimed to be safe, they then reported that the odor threshold of vinyl chloride was much higher to perpetrate the fraud that exposures after 1974 were safe and that apparent injuries were due to very high past exposures that no longer existed.

61

179. As a direct and proximate result of the overt tortious acts committed by defendants and/or Firestone in pursuance of their conspiracy, the plaintiff's decedent was unaware of the true health risks associated with the exposure to vinyl chloride.

180. As a further direct and proximate result of the overt tortuous acts committed in pursuance of their conspiracy, the plaintiff's decedent, during the course and scope of his employment, was exposed to toxic levels of vinyl chloride, which directly and proximately caused him to develop hepatic angiosarcoma and to suffer a premature and painful death.

181. Each of the foregoing tortious acts were performed by the defendants:

a. in concert with each other and/or Firestone;

b. pursuant to the conspiracy;

c. with the knowledge of each defendant that the other defendants' conduct, and /or Firestone's conduct, constituted substantial assistance or encouragement to accomplishthe result that persons in the position of Plaintiffs decdednt would be excessively exposed to vinyl chloride without proper warnings or precautions

d. with a common design among the defendants and/or Firestone and with substantial assistance from the other defendants and/or Firestone to accomplish the result that persons in the position of Plaintiffs decedent would be excessively exposed to vinyl chloride without proper warnings or precautions

.

182. All of the defendants herein are liable jointly and severally for the acts and omissions of the other defendants.

183. The defendants' tortious misconduct described above was committed with the malicious motive of endangering lives for the sake of profits.

184. As a direct and proximate result of the overt acts committed by the defendants in furtherance of their conspiracy, plaintiff's decedent incurred substantial medical expenses, suffered severe pain of mind and body, disability, limitation, loss of the pleasure of life and loss

of both past and future wages, and ultimately, a premature death.

WHEREFORE, plaintiff, Barbara Scibek, Executrix of the Estate of Walter Scibek, Deceased, demands judgment in her favor and against all defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) including delay damages, interest and allowable costs of suit and bring this action to recover same.

## COUNT V
### Wronful Death vs. All Defendants

185.   As a direct and proximate result of the foregoing, the aforesaid beneficiaries, suffered, are suffering and will for an indefinite period of time in the future suffer damages, injuries and losses including, but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from decedent, including monies which decedent would have provided for items such as clothing, shelter, food, medical care, education, entertainment, recreation and gifts.

186.   The wrongful death Beneficiaries are:

    a.  Barbara Scibek ( wife)
    b.  John C. Scibek (son)
    c.  Paula M. Reinert (daughter)
    d.  David R. Scibek (son)

187.   As direct and proximate result of the foregoing, the beneficiaries have been, continue to be and will be in the future, wrongfully deprived of money which decedent would have contributed to their support.

188.   As a direct and proximate result of the foregoing, the beneficiaries have been,

63

continue to be and will be in the future wrongfully deprived of the services, society and comfort, which decedent would have provided, including work around the home, physical comforts and services, society and comfort.

189.    As a direct and proximate result of the foregoing, the beneficiaries have been, continue to be and will be in the future wrongfully deprived of the guidance, tutelage and moral upbringing which they would have received from the decedent if not for defendant's negligence.

190.    As a direct and proximate result of the foregoing, the beneficiaries have been caused to incur and pay  expenses for medical treatment, hospital care, custodial care, nursing care and medicine rendered to decedent until the time of his death, and to provide care for the decedent themselves,  and to incur various funeral, burial and estate administration expenses for which plaintiff is entitled to compensation in this proceeding along with all other damages recoverable under the Pennsylvania Wrongful Death Act.

WHEREFORE, plaintiff, Barbara Scibek, as Executrix of the Estate of Walter Scibek, Deceased, and in her own right and on behalf of decedent's Wrongful Death Beneficiaries demands judgment in her favor and against all defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) including delay damages, interest and allowable costs of suit and bring this action to recover same.

## COUNT V
## Survival Action vs. All Defendants

191.    Plaintiff, Barbara Scibek, as Executrix of the Estate of Walter Scibek, Deceased, brings this action under the Pennsylvania Survival Act (42 Pa. C.S.A. §8302) and claims all damages properly recoverable under the aforesaid Pennsylvania Survival Act.

192.    As a direct and proximate result of the tortuous misconduct of defendants, as

64

aforementioned, Decedent, Walter Scibek, was wrongfully deprived of earnings and earning capacity from the onset of his illness through his date of death

193.    The Estate of Walter Scibek, Deceased, is entitled to recover in this action an amount equal to the gross amount he would have earned between the date of his death and the end of his life expectancy subject to the cost of maintenance and support.

194.    As a direct and proximate result of defendant's negligence, carelessness and recklessness as aforementioned, Decedent and his Estate incurred medical expenses, and Decedent has suffered unimaginable pain and suffering, loss of life's pleasures, inconvenience and all other damages recoverable under the Pennsylvania Survival Act.

WHEREFORE, plaintiff, Barbara Scibek, Executrix of the Estate of Walter Scibek, Deceased, demands judgment in her favor and against all defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) including delay damages, interest and allowable costs of suit and bring this action to recover same.

## JURY DEMAND

195.    Pursuant to Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury on all claims in this complaint.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands trial by jury and:

1.    Judgment for compensatory and general damages;

2.    All damages permitted by 42 Pa.C.S. §§ 8301 and 8302.

2.    Punitive damages against all defendants;

3.    Such other relief as the court deems just and equitable.


Respectfully submitted,


Mark R. Cuker
WILLIAMS CUKER BEREZOFSKY
One Penn Center at Suburban Station
1617 John F. Kennedy Blvd.
Suite 800
Philadelphia, PA  19103


\


_/s/ Andrew S. Lipton_
Andrew S. Lipton
LIPTON LAW, LLC
316 North Michigan Street
Suite 800
Toledo, Ohio 43624-1677
Telephone: 419- 241-2300
Fax: 419-936-5140

and

_/s/ Ronald L. Simon_
Ronald L. Simon
LAW OFFICES OF SIMON & ASSOCIATES
1707 N. Street NW
Washington, DC 20036
Telephone: 202-429-0094


66